Nancy CROWDER, Individually and as Independent Executrix of the Estate of James Ralston Crowder, Plaintiff-Appellee, Cross-Appellant,

v.

Ken SINYARD, et al., Defendants-Appellants, Cross-Appellees.

Nancy CROWDER, Individually and as Independent Executrix of the Estate of James Ralston Crowder, Plaintiff,

v.

Ken SINYARD, et al., Defendants-Appellees,

v.

Winston P. CROWDER, Appellant.

Nos. 88–2049, 87–2455.

United States Court of Appeals, Fifth Circuit.

Sept. 21, 1989.

Margaret R. Mitchell, Winston P. Crowder, Houston, Tex., for defendants-appellants, cross-appellees.

Bill Luppen, Asst. Atty. Gen., Little Rock, Ark., for Neel and Lambert.

Kirk D. Johnson, W. Kelvin Wyrick, Texarkana, Ark., for Miller Co., Ark. and Godwin.

Damon Young, Texarkana, Ark., for City of DeQueen, Ark. and Bill Jones.

David Folsom, Texarkana, Ark., Tex., for Sevier County.

William G. Bullock, Texarkana, Tex., for Aycock, et al.

William G. Bullock, Hubbard, Patton, Peek, Haltom & Roberts, Damon Young, David Folsom, Young, Patton & Folsom, Texarkana, Tex., Kirk D. Johnson, Texarkana, Ark., for all appellants except Lambert.

Frank J. Wills, III, J. Mark Lewis, Asst. Attys. Gen., Little Rock, Ark., for Charles Lambert.

Mary L. Sinderson, Lynn Cooksey, Houston, Tex., for appellees.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The primary issue in these consolidated appeals is whether the actions of various law enforcement officers and prosecutors in executing a search warrant and seizing certain pieces of personal property violated the Crowders'[1] first, fourth, and fourteenth amendment rights. After a jury trial, the district court rendered judgment in favor of the Crowders and awarded attorneys' fees.

These appeals followed. In No. 88–2049, all of the defendants that were held liable appeal from the judgment; as to that appeal, we vacate and remand. The Crowders cross-appeal on the ground that the district court erred by granting a judgment notwithstanding the verdict in favor of one of the governmental defendants; as to that cross-appeal, we affirm. In No. 87–2455, one of the Crowders' attorneys appeals, arguing that the district court erred in rejecting much of his claim for attorneys' fees. We dismiss that appeal as moot.

## I.

### A.

In the course of investigating a series of burglaries in southwest Arkansas in December 1980 and January 1981, law enforcement officials from Sevier County, Arkansas, and the City of DeQueen, Arkansas, a city in Sevier County, apprehended Terry Broyles in DeQueen. On the morning of January 27, 1981, Sevier County Sheriff David Godwin and DeQueen Chief of Police Bill Jones took Broyles to the Arkansas State Police Headquarters in Hope, Arkansas, for a polygraph examination.

While they were there, Godwin spoke with H.L. Phillips, a Miller County, Arkansas, Deputy Sheriff, who told him that a number of similar burglaries had occurred in Miller County. Phillips asked for, and received, permission to speak with Broyles, who implicated one Jay Wilson as the perpetrator of the Miller County burglaries. Phillips also indicated that Wilson

---

1. Although the suit was filed by both James Ralston Crowder and Nancy Crowder, Mr. Crowder has since died. His wife thus proceeds in both her individual capacity and as executrix of her husband's estate; for the sake of convenience, we sometimes refer to the plaintiffs collectively, although there is technically now only a single plaintiff proceeding in two capacities.

had a relative named J.R. (Jimmy) Bradshaw who was involved in the burglaries.

After the officers learned that Bradshaw was already in custody in Texarkana, Texas, on unrelated charges, the three officers decided to continue their investigation by taking Broyles to Texarkana, about thirty miles from Hope. Two other Arkansas officials—Charles Lambert, an Arkansas State Police investigator who had been assisting the Miller and Sevier County Sheriff's Offices in investigating the burglaries, and State Trooper R.W. Neal—also decided to go to Texarkana.

That same day, the officers—Godwin, Jones, Phillips, Charles Lambert, and Neal—all met at the Texarkana, Texas, Police Department Criminal Investigation Division (CID) headquarters at about 5:00 p.m. While the other four officials questioned Bradshaw, Jones took Broyles to Miller County for separate questioning by Miller County Deputy Sheriff Allen Jordan. Both men told similar stories, indicating that they had burglarized residences in Miller, Sevier, and Pike Counties in Arkansas and, on numerous occasions and under questionable circumstances, had sold stolen jewelry and silverware to James Ralston Crowder at the J.R. Crowder Insurance Agency in Texarkana, Texas.

On the basis of this information, Sgt. Gary Adams, the ranking on-duty officer of the Texarkana, Texas, CID, determined that probable cause existed to search the insurance agency for such stolen property. Adams contacted the Bowie County, Texas, Criminal District Attorney's Office and asked it to review his determination and assist in preparing an affidavit for a search warrant. Bowie County District Attorney Louis Raffaelli told Assistant District Attorney James Elliott to go to CID headquarters to assist Adams.

Elliott arrived at CID headquarters at about 9:00 p.m. After speaking with Adams and the other officers, and personally confirming with Broyles and Bradshaw what they had told the officers, Elliott concluded that there was probable cause only to search Crowder's office for those stolen items most recently sold to Crowder, as only those items would still likely be on the premises.

Elliott then drafted an affidavit, to be signed by Phillips, for a search warrant. The affidavit was based primarily upon information obtained from Broyles regarding two robberies that had occurred in the preceding week; it listed five items to be searched for and seized.[2] After reviewing

2. The affidavit reads, in pertinent part:

The undersigned affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath makes the following statements and accusations:

1. There is in Bowie County, Texas, a suspected place and premises described and located as follows: A one story beige brick office building located at 615 Olive, in the City of Texarkana, Texas. Located in front of the building is a large sign bearing the inscription J.R. Crowder Insurance.

2. There is at said suspected place and premises personal property concealed and kept in violation of the laws of Texas and described as follows: One round pocket watch, Elgin on face; One coin collection consisting of gold and silver American and foreign coins, 25 or 30 of which arein [sic] plastic packets; One indian [sic] head penny, gold plated; One money clip with dollar sign on it; and one piece of paper, kept in his desk in his office on which are certain figures ($500 minus sums of $10 and similar sums) which said paper is used to keep an account of a sum of money owed by

Jimmy Bradshaw to J.R. Crowder for the sale of stolen property.

. . . .

4. It is the belief of AFFIANT, and he hereby charges and accuses that: Two individual [sic] named Terry Boyles [sic] and Jimmy Bradshaw have sold numerous items acquired by theft to J.R. Crowder at the residence listed in paragraph number one in this Affidavit for Search and Arrest; Affiant believes that J.R. Crowder is possessing these items in violation of Penal Statute 31.03 Texas Penal Code, and such offense occurred in Bowie County, Texas.

5. AFFIANT has probable cause for said belief by reason of the following facts: Affiant, Miller County Deputy Sheriff H.L. Phillips is employed by the Miller County Sheriff's Department and is currently assigned to working cases involving crimes committed by Terry Boylesand [sic] and Jimmy Bradshaw. The said Terry Boyles [sic] is presently in the custody of the Miller County Sheriff's Office and is being held for the charge of breaking and entering and theft over $100.00. On this date, January 27, 1981, Terry Boyles signed a Written volun-

the signed affidavit, a magistrate executed a form warrant authorizing a search of the agency for the specified items and the arrest of Crowder.[3]

Adams, accompanied by Detective Louis Aycock of the Texarkana, Texas, CID and the two suspects (Bradshaw and Broyles), drove to Crowder's home to obtain his assistance in gaining entry to his office. After Crowder identified Bradshaw and Broyles as persons with whom he had done business, he complied with the officers' request or instruction that he accompany them to the insurance agency for the execution of the search warrant.

Crowder, Adams, and Aycock entered the insurance agency at approximately 11:30 p.m. Shortly thereafter, and at Adams's request or invitation, they were joined by all of the following Arkansas officers: Miller County Sheriff Ken Sinyard, Jordan, Phillips, Godwin, Jones, Charles Lambert, and Neal.[4] Raffaelli and Elliott, who went to the agency but did not enter it at this time, remained in a parked car for a short while and then left to perform a personal errand.

A three-hour search of the agency ensued. After being informed, at least partially, of the items mentioned in the warrant, Crowder went to his desk and pulled out a sheet of paper resembling the document described in the affidavit. At various officers' request or instruction, Crowder opened several heavy, locked file cabinets, from which the officers collected jewelry, coins, and other items; various officers also searched for and seized items found in several desks and a footlocker. At one point or another, each of the officers participated in the search and seizure by looking into the file cabinets, the footlocker, or the desks and inspecting the objects in the room.[5] Four of the seized items were described in the search warrant, but most were not. Rather, the officers testified that they seized the items because they matched the description of items taken in other burglaries in Sevier and Miller Counties.[6]

Ultimately, forty-six untagged items were deposited in a sack and removed to CID headquarters. The search ended abruptly when, at approximately 2:30 a.m.,

---

tary statement (a copy of which is attached hereto as Exhibit A and is by this reference is [sic] incorporated herein for all purposes) in which he admitted that be [sic] stole numerous items, part of which arelisted [sic] in paragraph 2 of this affadavit [sic]; and sold them to J.R. Crowder at the office building located at 615 Olive in the city of Texarkana, Texas, on the 23rd of January 1981.

Terry Boyles [sic] further related that there is a sheet of paper kept in a desk at this office on which are certain figures ($500 minus sums of $10 and similar sums), which said paper is used to keep an account of a sum of money owed by Jimmy Bradshaw to J.R. Crowder for the sale of stolen property.

Attached to the warrant was a signed statement from Broyles indicating that he and another suspect had sold stolen "silver and gold items" to Crowder on January 23, 1981.

3. Although the form warrant authorized the arrest of Crowder as well as a search of his offices, the jury found that he was not arrested, and this finding is not challenged on appeal.

4. At some point during the search, the officers were also joined by Donald Lambert, an agent with the Federal Bureau of Investigation (FBI). The extent of his involvement in the search and seizure is unclear; in any event, as the jury did not find him liable, and the plaintiffs do not appeal this finding, we need do no more than note his presence.

5. The extent of participation by Raffaelli and Elliott is more difficult to discern. The evidence establishes that, after they returned from their personal errand, they entered the agency and were present for the last 60 to 90 minutes of the search. There is no evidence that either of them actively participated in the search, although several of the officers testified that Elliott was the person "in charge" of the night's events. Elliott also rendered legal advice to the officers to the effect that they should not seize a particular coin collection and pearl necklace found in one of the file cabinets; similarly, at one point Raffaelli prohibited the officers from seizing gold and silver ingots that the officers suspected had been refined from stolen property.

6. The testimony establishes that, during the search, Phillips and Jones consulted lists containing information regarding property taken in burglaries other than those upon which the affidavit was based. Similarly, Godwin testified that he was "hunting big silver" taken in two Sevier County burglaries not mentioned in the affidavit.

Crowder's attorney arrived at the agency in the company of a private investigator with a video camera. The attorney began to ask questions regarding the search and seizure and disposition of the untagged items. All of the officers quickly left the premises; Raffaelli and Elliott stayed on the scene long enough to inform the attorney that any questions he had could be raised at a judicial hearing the next day, as provided in the Texas Code of Criminal Procedure.

Back at CID, Phillips and Aycock inventoried the seized property. Pursuant to Sinyard's request, Aycock, after consulting with Raffaelli, agreed to release the property to Miller County officials. Early that morning, Phillips signed a receipt for the property and took it to Miller County.

### B.

On or about February 1, 1981, Crowder filed a petition in Texas state court against Raffaelli, Elliott, Donald Lambert, Aycock, and "other persons unknown." Crowder sought to have the court order the defendants to deposit the seized property into the registry of the court pending a determination of the legality of the search and seizure and of Crowder's entitlement to the property. After a hearing, the court issued such an order. The defendants appealed the order to a Texas intermediate appellate court, which dismissed the appeal on the ground that it lacked jurisdiction to hear an appeal from an order that only compelled a party to place property into the registry.

In an attempt to comply with the court's order, the Texas officials—Raffaelli, Elliott, and Aycock—contacted the Miller County Sheriff's Office and requested the return of the property. However, acting under legal advice, Miller County officials refused to comply. Moreover, as Crowder had failed to join the Miller County officials as defendants, the Texas state court could not compel them to turn over the property. No further proceedings took place in state court.

### C.

Crowder and his wife filed suit under 42 U.S.C. § 1983 against every person involved in the search and their respective governmental entities. By the time the case went to trial, the Crowders were asserting two theories of liability: (1) that the defendants violated their constitutional right of access to the courts by allowing the seized property to be removed from Texas; and (2) that the defendants violated their fourth amendment rights by carrying out an unreasonable search and seizure. The individual defendants, in addition to denying the existence of any violations, also sought to prove at trial, *inter alia,* that they were entitled to qualified immunity from liability under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The case went to trial before the Honorable William Wayne Justice. The jury answered forty-four special interrogatories regarding various factual issues in the case. Interpreting the jury's answers, the court found that none of the defendants was entitled to qualified immunity; that Sinyard, Phillips, Jordan, Adams, Raffaelli, Elliott, Campbell, Miller County, Bowie County, and the City of Texarkana were all liable for violating the Crowders' right of access to the courts; and that Sinyard, Phillips, Godwin, Jones, Charles Lambert, Miller County, Sevier County, and the City of DeQueen were liable for violating the Crowders' fourth amendment rights. After granting Campbell's and the City of Texarkana's motions for judgment notwithstanding the verdict (j.n.o.v.), the court entered judgment against the remaining defendants it had found liable and, under 42 U.S.C. § 1988, awarded the Crowders attorneys' fees.

The parties against whom judgment was entered appeal on numerous grounds; the Crowders cross-appeal, arguing that the court erred by granting the City of Texarkana's motion for j.n.o.v. In a related appeal, one of the Crowders' attorneys contends that the court erred by awarding him an inadequate amount of attorneys' fees.

## II.

The defendants found liable for violating the Crowders' constitutional right of access to the courts contend that, as a matter of law, their actions did not violate that right. We agree.

### A.

Although judicial recognition of the constitutional right of access to the courts occurred long ago,[7] the current contours of the right can best be described as nebulous. If for no other reason, this is because much of the development of the right has occurred in the prison context, where state officials have the capability of exercising both direct and indirect control over the litigation activities of incarcerated individuals. It is thus to these cases that we turn first for instruction, although they are of limited use in this case.

In its most obvious and formal manifestation, the right protects one's physical access to the courts. Thus, for example, prison officials cannot refuse to transmit, or otherwise block, through procedural devices, the transmission of legal documents which prisoners wish to send to the courts. *See Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (striking down a state regulation prohibiting prisoners from filing petitions for habeas corpus without the approval of a state official); *Jackson v. Procunier,* 789 F.2d 307, 310–11 (5th Cir. 1986) (prison officials may not deliberately delay mailing legal papers when they know that such delay will effectively deny a prisoner access to the courts). Nor can they take other actions—such as taking or destroying legal papers—that have a similar effect. *See Houston v. Lack,* —— U.S. ——, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Morello v. James,* 810 F.2d 344, 346

(2d Cir.1987); *Sigafus v. Brown,* 416 F.2d 105, 107 (7th Cir.1969).

As we have pointed out, however, our cases also stand for the proposition that

> [a] mere formal right of access to the courts does not pass constitutional muster. Courts have required that the access be 'adequate, effective, and meaningful.'

*Ryland v. Shapiro,* 708 F.2d at 972 (quoting *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977)). Thus, the constitutional right of access to the courts prohibits prison officials from unreasonably limiting access to legal personnel or other prisoners who can provide legal advice. *See Procunier v. Martinez,* 416 U.S. 396, 419–22, 94 S.Ct. 1800, 814–16, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* —— U.S. ——, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969).

Not all aspects of the constitutional right of access to the courts are prohibitory in nature; for example, the right requires that prison officials "provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498. Similarly, courts have required that prison officials provide indigent prisoners with drafting materials and postage. *Id.* at 824–25, 97 S.Ct. at 1496–97; *Chandler v. Coughlin,* 763 F.2d 110, 114–15 (2d Cir. 1985).

In the world of litigation outside prison walls, these cases are of little assistance. Unlike prisoners, ordinary individuals do not find any physical barriers between them and the courts. To file a complaint or legal paper, they need merely travel to the courthouse or even just the nearest mail-

---

**7.** The origins of the right can be traced to *Chambers v. Baltimore & Ohio R.R.,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907): The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship. . . .

Although this discussion of the right took place in the context of the privileges and immunities clause of article IV, section 2 of the Constitution, the right has also been said to derive from the due process clauses of the fifth and fourteenth amendments and the right of petition found in the first amendment. *See generally Ryland v. Shapiro,* 708 F.2d 967, 971–72 (5th Cir.1983) (citing cases).

box; to obtain legal advice, they need only travel to a lawyer's office or the nearest law library, or pick up the telephone. If the constitutional right of access has any sweep outside the prison context, therefore, it must be based upon a more nuanced interpretation of the requirement that such access be "adequate, effective, and meaningful."

One such interpretation has been offered by our court in *Ryland v. Shapiro*. In that case, the parents of a murder victim filed an action under 42 U.S.C. § 1983 against several state prosecutors, alleging that two of them engaged in a cover-up of the fact that a murder had occurred and that the murderer was Shapiro, a fellow prosecutor. Their claim was that, by concealing such facts for a period of eleven months, the defendants caused them to delay bringing a wrongful death action against the murderer and thus "wrongfully interfer[ed] with their access to the state courts to pursue their tort claim." 708 F.2d at 970. The district court, viewing their complaint as alleging that the defendants failed to enforce the criminal laws of Louisiana, dismissed for lack of standing.

■ We reversed, holding that the district court had failed to consider the legal theory—deprivation of their constitutional right of access to the courts—advanced by the Rylands, a claim for which, we concluded, they did have standing. We then proceeded to address the sufficiency of the complaint. The delay created by the defendants, we concluded, could constitute a constitutional deprivation of the Rylands' right of access to the courts if they could make a showing of prejudice:

> Applying these principles to our case, we cannot say with certainty that there is no possibility that any set of facts which might be proved in support of the allegations would entitle the Rylands to some relief.... The defendants' actions could have prejudiced the Rylands' chances of recovery in state court because the resulting delay would cause stale evidence and the fading of material facts in the minds of potential witnesses. Moreover, it could well prove more expensive to litigate such action.

*Id.* at 974–75.[8] On its facts, therefore, *Ryland* stands for the proposition that if state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation.[9]

---

**8.** The *Ryland* court also surmised, without citation to authority, that "any interference with a substantive constitutional right, such as the right of access to the courts, may by itself amount to a constitutional deprivation (unless reasonably justified by a countervailing state interest)." 708 F.2d at 975. We interpret this sentence as merely re-emphasizing the point that if a plaintiff proves that his constitutional right of access to the courts has been violated, a constitutional deprivation has occurred, and he or she will have a cause of action under § 1983 against those state actors causing the deprivation. Any other reading of the sentence renders it inconsistent with long-established constitutional precedents that recognize that "interference" and "violation" are entirely different concepts. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, ——, 108 S.Ct. 1319, 1324, 99 L.Ed.2d 534 (1988) ("It is undisputed that the Indian respondents' beliefs are sincere and that the Government's proposed actions will have severe adverse effects upon the practice of their religion. Respondents contend that the burden on their religious practices is heavy enough to violate the Free Exercise Clause unless the Government can demonstrate a compelling need to complete the G–O road or to engage in timber harvesting in the Chimney Rock area. We disagree."). We are still left with the question, however, of what constitutes a violation of the constitutional right of access to the courts, a question which *Ryland* answers by requiring a showing of prejudice.

**9.** Other courts considering official cover-ups similarly have held that a showing of substantial prejudice to the plaintiff's rights is required. *See Bell v. City of Milwaukee,* 746 F.2d 1205, 1260–61 (7th Cir.1984) (police officers could be found liable for concealing from a murder victim's family key facts that would form the basis for redress); *Agresta v. Sambor,* 687 F.Supp. 162, 167 (E.D.Pa.1988) (same); *Germany v. Vance,* 673 F.Supp. 1143, 1149 (D.Mass.1987) (state officials who failed to inform then-incarcerated minor that key witness had recanted testimony may be sued for violating her right of access to the courts, insofar as "failure to dis-

## B.

It is immediately apparent that the Crowders must urge us to break new ground in this area of the law, as they allege neither cover-up nor retaliation. We decline their invitation, holding that no violation of the constitutional right of access to the courts occurred in this case.

The essence of the Crowders' theory on this issue is that by causing or allowing the property seized during the search to be physically removed to Arkansas, the defendants interfered with the Crowders' ability to use the Texas court system to recover the property. The defendants' actions, as the district court reasoned in its memorandum opinion, "destroyed or impaired the rightful jurisdiction of Texas courts over the seized items, thus interfering with [the Crowders'] ability to litigate ownership of the property in Texas." [10]

Although we agree that the removal of the seized property to Arkansas may have complicated, in some way, the Crowders' efforts to use the Texas judicial system to test the legality of the search and seizure

close facts which are essential to an incarcerated individual's claim for relief may be more effective in denying access to the courts than destroying court papers or limiting access to the mail") (footnote omitted), *aff'd in part, rev'd in part,* 868 F.2d 9 (1st Cir.1989). *Cf. Howland v. Kilquist,* 833 F.2d 639, 642 (7th Cir.1987) (in the context of *pro se* prisoner litigation, stating that "some showing of detriment caused by the challenged conduct must be made in order to succeed on a claim alleging a deprivation of the right to meaningful access to the courts" (citations omitted)).

There is a final category of cases as to which the courts have found the constitutional right of access to the courts to be implicated. Drawing again from the prison context, courts have held that if state officials in some way retaliate against an individual for seeking redress through the courts, they have violated that person's right of access to the courts. *See Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1428 (8th Cir.1986) (plaintiffs who contend that state officials filed a frivolous condemnation counterclaim in order to force the plaintiffs to settle a nuisance lawsuit against the Commission and sell their property have stated a claim for infringement of their constitutional right of access to the courts); *Silver v. Cormier,* 529 F.2d 161, 163 (10th Cir.1976) ("A public official's threats to a citizen to withhold monies due and owing, should legal proceedings on an independent matter be instituted, burdens or chills constitutional rights of access to the courts."). We cite these cases as general background and do not have occasion to approve or disapprove of their respective holdings.

**10.** According to the Crowders, the statutory procedures governing the disposition of seized property contemplate that the court will have jurisdiction over the *res.* At the time of the seizure, Tex.Code Crim.P. art. 47.01 provided that "[a]n officer who comes into custody of property alleged to have been stolen must hold it subject to the order of the proper court or magistrate." *Cf. id.* art. 18.11 ("When a warrant has been issued to search a suspected place and there be found any property as alleged to have been there kept or concealed, the same shall be safely kept by the officer seizing the same, subject to the further order of the magistrate [who issued the warrant].").  In turn, Tex.Code Crim.P. art. 47.01a provided that

[i]f no criminal action is pending, a magistrate of the county or city in which the property is being held may hold a hearing to determine the right to possession of the property, upon the petition of any interested person. The magistrate shall order the property delivered to whoever has the superior right to possession, subject to the condition that the property be made available to the prosecuting authority should it be needed in the future, or the magistrate may remand the property to the custody of the peace officer.

The Crowders contend that the purpose of the two provisions commanding the seizing officer to "safely keep" the property is to ensure that the magistrate, in order to effect fully his powers under art. 47.01a, will have jurisdiction over the *res.* By preventing the magistrate from exercising direct power over the property, they contend, the defendants interfered with the Crowders' ability to use the Texas court system to litigate their rights to the seized property.

Shortly after these events, the Texas Legislature amended arts. 18.10 and 18.11 to provide that, *inter alia,*

[t]he officer who seized the property shall retain custody of it until the magistrate issues an order directing the manner of safekeeping the property. The property may not be removed from the county in which it was seized without an order approving the removal, issued by a magistrate in the county in which the warrant was issued; provided, however, nothing, herein shall prevent the officer, or his department, from forwarding any item or items seized to a laboratory for scientific analysis.

Tex.Code Crim.P. art. 18.10 (1989 Supp.) (eff. Sept. 1, 1981). In 1987, the Legislature also amended art. 47.01a. *See* Tex.Code Crim.P. art. 47.01a (1989 Supp.) (eff. Aug. 31, 1987). As the events underlying the Crowders' claim took place in January and February 1981, these amendments are irrelevant to our analysis.

or to recover the property, we cannot agree that the defendants' actions violated the Crowders' constitutional right of access to the courts. Contrary to their claims, "adequate, effective, and meaningful" access appears to have been available to them under Texas law; responsibility for their failure to utilize such access effectively cannot be placed upon the defendants.

That the Crowders had "access" to the Texas courts cannot be denied. Within a few days after the search, they brought their grievances before such a court, which, exercising its jurisdiction under Texas law, heard those grievances. Moreover, they obtained precisely the initial relief sought in their petition: an injunction ordering the Texas defendants to transfer the property into the registry of the court pending a determination as to the propriety of the search and seizure. The question in this case is thus not one of "access"; rather, it is whether that access was "adequate, effective, and meaningful."

As an initial matter, we find it difficult to understand how the Crowders can contend that, having received all of the relief requested in state court, their access to relief there was nonetheless "obstructed" such that a denial of their constitutional rights occurred. The right of access to the courts is what may be described as a facilitative right: It is designed to ensure that a citizen has the opportunity to exercise his or her legal rights to present a cognizable claim to the appropriate court and, if that claim is meritorious, to have the court make a determination to that effect and order the appropriate relief. That is precisely what has occurred in this case.

The constitutional right of access does not, however, guarantee one the right to have one's case proceed in a particular procedural posture or the right to a particular form of relief. We thus see no significance in the fact that the defendants' actions, by depriving the state court of jurisdiction over the *res*, eliminated the possibility that it could exercise direct control over the property. Effective legal redress was nonetheless available to the Crowders.

As both the Crowders and the district court conceded, for example, the Crowders could have amended their petition to add all of the Arkansas officials as defendants under the Texas Long Arm Statute, Tex.Civ. Prac. & Rem.Code §§ 17.041–17.045, insofar as they could be characterized as tortfeasors whose offending acts—participating in the seizure and obtaining allegedly unlawful possession of the property—occurred in Texas.[11] Had the Crowders done this, the full panoply of the Texas state court's powers would have extended to the persons in actual possession of the property, thus greatly increasing the court's ability to obtain physical control over the property.

Although we do not resolve the question here, we also have no reason to believe that the Crowders did not have an adequate remedy at law in their state court action. If, as they now allege, the Texas officials violated their statutory duties in failing to retain custody of the property, or, alternatively, if they had been able to establish their rights to possession of the property,[12] there is a substantial possibility that the Texas officials—as well as the Arkansas officials, should the Crowders have chosen to join them as defendants—would have been liable for money damages in an action sounding in tort, should the property not have been recovered.[13]

11. Indeed, this is precisely the basis upon which the federal district court obtained personal jurisdiction over the same defendants in this action.

12. Even if a state court could not have obtained *in rem* jurisdiction, there is no reason to believe that Texas courts were incapable of determining the propriety of the search and seizure and the parties' respective rights to the property. Assuming that the Texas statutes governing the disposition of seized property contemplate that the court will have jurisdiction over the *res*, there is no indication that such is a jurisdictional prerequisite; indeed, a Texas court did exercise its jurisdiction over the Crowders' action without having *in rem* jurisdiction.

13. The Crowders contend that *Wolfenbarger v. Williams*, 774 F.2d 358 (10th Cir.1985), *cert. denied*, 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986), establishes that the presence of other remedies will not excuse a violation of statutorily-required procedures regarding seized

In sum, we conclude that, as a matter of law, no violation of the Crowders' constitutional right of access to the courts occurred. The Crowders had unimpeded and meaningful access to the state courts—and, as this action shows, the federal courts—to challenge the legality of the defendants' actions; that they failed to pursue aggressively all of their legal remedies in the face of what is admittedly a novel legal situation cannot be the basis for visiting liability upon the defendants.

### III.

The Crowders also obtained jury findings indicating that individual defendants Sinyard, Phillips, Godwin, Jones, and Charles Lambert violated their fourth amendment rights by engaging in an unlawful search and seizure. Because the jury also found that the acts of Sinyard, Godwin, and Jones represented the official policies of Miller County, Sevier County, and the city of DeQueen, respectively, the district court also found the three governmental units liable for violating the Crowders' fourth amendment rights. The defendants contend (1) that there was not sufficient evidence to establish a fourth amendment violation; (2) that they are immune from liability as a matter of law; and (3) that the district court erred by instructing the jury that the defendants bore the burden of proof on the crucial issue of whether the items seized were in "plain view."

We conclude that, as to four of the five individual defendants, a new trial is required on the question of whether an unlawful search and seizure occurred; as to those four defendants, however, we also conclude that the district court erred in denying their motion for a directed verdict or j.n.o.v. on the ground of qualified immunity. Finally, because our resolution of the qualified immunity issue does not extend to the governmental units,[14] we reach the de-

fendants' third contention and hold that the court erred in placing upon them the burden of proof on the "plain view" issue. Consequently, as to the governmental units we conclude that a new trial is required on the fourth amendment claim.

The Crowders' fourth amendment claim was presented to the jury on special interrogatories. The jury found, *inter alia*, the following facts:

(1) that a reasonable person would have believed that the information contained in the affidavit underlying the search warrant was reliable;

(2) that a reasonable person would not have concluded, upon the basis of the reference in the affidavit to the statute defining the offense of unlawful appropriation of property (Texas Penal Code § 31.03), that Crowder knew, or could be prsumed to have known, that the property he bought from Broyles was stolen;

(3) that a reasonable person would have believed that the description in the search warrant of the premises to be searched was insufficient;

(4) that a reasonable person would have believed that one of the five objects to be seized was described in the warrant with insufficient particularity;

(5) that the defendant officers had the reasonable and good-faith belief that the warrant was valid;

(6) that the officers searched in only those places where it would be reasonable to find the items described in the search warrant;

(7) that only six of the items seized were in "plain view" of the seizing officers; and

(8) that Sinyard, Phillips, Godwin, Jones, and Charles Lambert intentionally searched the premises for property not described in the search warrant.

---

property. In *Wolfenbarger,* however, the court was considering the effect of the availability of post-deprivation remedies upon a procedural due process claim, not a claim based upon the substantive right of access to the courts. *See id.* at 362–65. The Crowders make only the latter claim and specifically forswear any procedural

due process claim; we are thus not presented with the issue of whether the availability of these remedies comports with the requirements of the due process clause.

**14.** *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The district court interpreted these findings as indicating that the defendants had violated the Crowders' fourth amendment rights by engaging in a "general, exploratory" search for items that were not described in the search warrant and that did not fall within the "plain view" exception to the warrant requirement.[15]

We address here three of the defendants' arguments. First, both the individual and governmental defendants assert that the evidence is insufficient to support the jury's finding that the individual defendants "intentionally searched the business premises of J. Ralston Crowder for property not described in the search warrant." Second, the individual defendants argue that the court erred in not holding that they were entitled to qualified immunity as a matter of law. Finally, both groups of defendants contend that the district court erred in instructing the jury on the issue of whether the items seized but not described in the warrant were in "plain view."

### A.

In reviewing the challenged jury finding, we look to see whether "there is evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions." *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). Because the jury found in favor of the plaintiffs on this factual question, we assess the evidence "in the light and with all reasonable inferences most favorable" to the plaintiffs. *Id.* at 374.

After a careful review of the record, we conclude that the evidence adduced at trial is sufficient to support this factual finding as to four of the five individual defendants. We address the evidence concerning each defendant in turn.

### 1.

(a) *Miller County Sheriff Sinyard.* At the time of the search, Sinyard did not know which items were described in the search warrant; although he denied "searching" for anything, he admitted in his deposition that he was present at the scene to identify stolen property.[16] He twice looked into open file drawers in Crowder's office; he denied, however, that he handled or seized anything in the drawers. With FBI agent Donald Lambert, he requested that Crowder open a safe; he also conducted Donald Lambert on a tour of the premises, although he denied that they were looking "for" anything in particular. Finally, one of his first acts upon arriving at the scene of the search was to ask his deputy, Phillips, whether he had found any of the items on a list used by Phillips to identify stolen property not listed on the warrant.

(b) *Miller County Deputy Sheriff Phillips.* Phillips, upon whose affidavit the search warrant was based, had knowledge of the items described in the search warrant. At trial, he testified that he went with the Texas officers to Crowder's office to assist in the search for those items. In his deposition, however, Phillips testified that he went to the office to "help identify the property, compare it with my stolen report." By Phillips's own admission, he looked at a number of items that had been removed from various drawers and deposited on a desk in the office[17] and recognized

---

15. To avoid any confusion, we also note that the district court did not decide whether the jury's answers indicated that the warrant—and therefore the search carried out for specifically those items described in it—was invalid. Were we to address this question, we likely would have to undertake an inquiry which the district court avoided, namely, reconciling the jury's inconsistent findings (numbers (1) through (5) above) regarding the reasonableness of the officers' reliance upon the warrant. Because the finding of liability on this claim obviously was premised upon the jury's finding that Sinyard, Godwin, Phillips, Jones, and Charles Lambert went

beyond the scope of the warrant, we likewise do not express any view as to the validity of the warrant.

16. At trial, Sinyard denied that he was present at the search for the purpose of identifying stolen property.

17. The testimony at trial indicated that, after opening one of the file drawers, Crowder handed Adams a zip-lock bag containing numerous items which he indicated he had bought from Broyles and Bradshaw. Other testimony indicated that at least some of the items were shown

a ring reported as stolen in a burglary that was not a basis for the warrant. At that point, he requested that a list of stolen property from one or more burglaries be brought to the office so that he could compare the items on the desk with items on the list.

(c) *Sevier County Sheriff Godwin.* Godwin testified that it was primarily his idea to get a warrant to search Crowder's office, because "we lost a lot of stuff, and we were trying to get it back." At the time of the search, however, he had not seen the contents of the affidavit or the warrant, although he testified that he had been told which items were listed on the warrant. As Crowder opened the file drawers, Godwin looked into them, and he participated in showing the contents of at least one of the drawers to the burglars to see whether they could identify any of the items as stolen. By his own admission, he was "hunting the big silver [trays, goblets, and the like] that my people in Sevier County had lost"—items that were not listed in the affidavit or warrant. He also admitted having a list of at least thirty items, not described in the warrant, for which he was looking. Testimony from other officers indicated that Godwin participated in seizing items from the drawers.

(d) *DeQueen Chief of Police Jones.* By his own admission, Jones never saw the search warrant and thus could not have been searching for the items listed in the warrant. In his own words, he was there primarily to identify property, stolen in one of the related burglaries, that was suspected to be on the premises but was not listed in the warrant. Although he denied "searching" anything in that he did not physically open any drawers or other items in the office, he did admit that he looked into drawers opened by Crowder or others.

(e) *Arkansas State Police Investigator Charles Lambert.* Charles Lambert did not read or know the content of the warrant. His primary task at the scene of the search was to guard one of the burglary suspects in a hallway outside Crowder's office. At one point, he looked into one of the file drawers out of curiosity and saw a number of gold and silver bars; he did not look into any other drawers or engage in any other activities related to the search.

2.

The jury specifically found that the officers searched only in those places where it would be reasonable to find the items described in the search warrant, and that the officers had the reasonable and good-faith belief that the warrant was valid. The question, then, is whether Sinyard, Phillips, Godwin, Jones, and Charles Lambert, who admittedly were not present to search for the six items listed in the warrant, violated the fourth amendment by being present and, in the case of some of them, comparing items found by the other officers with lists of items thought to have been taken in related burglaries.

We have held repeatedly that similar actions by "outside," or additional, officers does not violate the fourth amendment where there has been an initial, lawful intrusion. For example, in *United States v. Green,* 474 F.2d 1385 (5th Cir.), *cert. denied,* 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973), a local fire marshal was lawfully present at a burned premises to investigate the origin of a fire that had just been suppressed. Sifting through the rubble, he located metal plates that appeared to have been designed for counterfeiting. He called a United States Secret Service agent who, without seeking a warrant, came to the premises and seized the plates.

We held that no fourth amendment violation occurred. We first determined that "[t]he activity that led to the discovery of the plates was within the scope of the justification for the fire marshal's intru

to Broyles and Bradshaw so that the two burglars could identify whether they were stolen property. Regardless of whether Broyles and Bradshaw identified the property as stolen, Adams, because the burglars had told the officers that all of the items they had sold Crowder were stolen, took all of the items and deposited them on a desk. The record does not reveal, however, whether all of the items placed on the desk were eventually removed from the premises.

sion" and that he was not required to stop his investigation to obtain a warrant once the plates were discovered. *Id.* at 1389. More significantly, we concluded that given the lawful intrusion, the arrival and participation of another official—even one from a different agency—was fully constitutional:

> The purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. Where a lawful intrusion has already occurred and a seizure by a State officer has validly taken place as a result of that intrusion, the invasion of privacy is not increased by an additional officer, albeit a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence. Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized. *Terry v. Ohio*, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Harris v. United States*, 1968, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed. 1067. The apparent conflict between the Constitution and common sense which the plain view doctrine has reconciled is the same misconception which we here seek to dispel. *See Mapp v. Ohio*, 1961, 367 U.S. 643, 647, 81 S.Ct. 1684 [1687], 6 L.Ed.2d 1081.

*Id.* at 1390.

Later, in *United States v. Brand*, 556 F.2d 1312 (5th Cir.1977), the defendant sought to suppress illegal drugs confiscated by police who entered his house without a warrant. One police officer had accompanied an ambulance attendant who had been summoned to the house. He and another officer who arrived as the defendant was being put into an ambulance saw hypodermic needles, marihuana butts, and pills in plain view and called a narcotics investigator to the scene. After arriving and observing the suspicious items at the scene, the investigator directed that a warrant be obtained.

The defendant asserted that the only officer who had entered lawfully was the one who accompanied the ambulance attendant, as the exigent circumstance had ended by the time the other officers had arrived. Writing for the court, Judge Wisdom rejected defendants' assertion because

> it misconceives the nature of the fourth amendment interest at stake. The amendment protects the citizen against invasion of privacy. Once that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion. As this Court has held repeatedly, additional investigators or officials may therefore enter a citizen's property after one official has already intruded legally.[9] *E.g., United States v. Green*, 5 Cir.1973, 474 F.2d 1385, 1390, *cert. denied*, 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63; *United States v. Herndon*, S.D.Fla.1975, 390 F.Supp. 1017, *aff'd*, 5 Cir.1976, 536 F.2d 1027; *see Steigler v. Anderson*, 3 Cir.1974, 496 F.2d 793, 797–98, *cert. denied*, 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277. Later arrivals may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist. *Id.* Thus, the validity of the affidavit is not vitiated by the late entry of the affiant and the other policemen.

> ---
> [9] Of course, the later officials must confine their intrusion to the scope of the original invasion unless a warrant or one of the exceptions to the warrant requirement justifies a more thorough or wide ranging search.

*Id.* at 1317–18.

To the same effect, in *United States v. Roberts*, 619 F.2d 379 (5th Cir.1980), local deputy sheriffs entered an apartment pursuant to a warrant authorizing them to search for a television set. While there, they observed possible gambling paraphernalia and called the Federal Bureau of Investigation. Federal agents arrived and

joined the local officers in seizing the gambling-related items. In an opinion by Judge Rubin, the court upheld the denial of a motion to suppress. Citing, *inter alia, United States v. Green,* the court held that the decision to await arrival of the federal officers, to assist in identifying the contraband before seizing it, "does not affect the validity of the seizure." *Id.* at 381.

Finally, in *Vance v. United States,* 676 F.2d 183, 189 (5th Cir.1982), we summarized the import of these cases in an opinion by Judge Politz:

> The common thread in *Green, Brand,* and *Roberts* is two-pronged: the law enforcement officer initially entering the protected area was justified in doing so, and, while there, he observed items of an obviously illegal character. In such an instance, the officer could appropriately share the information with other law enforcement personnel bearing particular responsibility in that field. In those instances, warrants were not necessary to authorize the conduct of the later arriving officers.

We noted, as well, that the "plain view doctrine is limited to 'inadvertent discoveries of evidence by police officers acting within the scope of an otherwise justified intrusion.' [*Roberts,*] 619 F.2d at 381 (*quoting Coolidge v. New Hampshire,* 403 U.S. [443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971) (plurality opinion) ])."

These cases inform us that we look to the element of intrusiveness to determine whether the presence of additional officers violates the fourth amendment: If their presence effects no intrusion other than that which is implicated by a lawful entry, there is no violation. We look first, then, at whether the entry by the officers who were in fact looking for the items listed in the warrant was lawful. We need not consider, in this case, whether the search warrant was valid,[18] as the jury specifically found that all of the officers[19] acted in the good-faith belief that the warrant was valid. Under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), this good-faith belief renders lawful the presence of the officers who entered under authority of the warrant and were searching for items listed therein.

■ We next inquire whether the officers who were not looking for items in the warrant enlarged, by their presence and their activities, the extent of the intrusiveness. In other words, we must heed the warning of *United States v. Brand* that "the later officials must confine their intrusion to the scope of the original invasion...." 556 F.2d at 1317 n. 9.

This matter was addressed by the jury, which specifically found that no officer searched in places where it would be unreasonable to find the items described in the warrant. Thus, the intrusion, for fourth-amendment purposes, was the same as it would have been if no officer had been present who was not looking only for items listed in the warrant. In other words, the search of Mr. Crowder's premises—and any consequent invasion of privacy—at no point exceeded the search that was authorized by the warrant, as no officer went beyond the intrusion which the warrant countenanced.

It follows that under *Green, Brand, Roberts,* and *Vance* the presence and participation of additional officers—even those present to investigate other crimes or to provide expert guidance—does not render unlawful an intrusion by other officers who are properly on the scene. The facts here are perhaps closest to those in *Green,* where the fire marshal, lawfully on the scene, uncovered items that arguably were instrumentalities of crime. He called "a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence." *Green,* 474 F.2d at 1390. In the case *sub judice,* the evidence reflects that, at least for the most part, the officers

---

**18.** By intimating no view as to whether the warrant was valid, we do not wish to imply that it was not.

**19.** I.e., Sinyard, Phillips, Jordan, Godwin, Jones, Aycock, Adams, Raffaelli, Elliott, Neel, Charles Lambert, Don Lambert, and Campbell.

looking for the items in the warrant did the "searching"—opening of drawers, and the like—and that when items were unexpectedly uncovered that were not listed in the warrant but that may have been contraband, other officers were on the scene to determine, by using their own lists or their own knowledge, whether the items appeared to have been stolen. The first officers "could appropriately · share the information with other law enforcement personnel bearing particular responsibility in that field." *Vance*, 676 F.2d at 189.

It is of no moment that the officers here all arrived at about the same time.[20] For evaluating the extent of an intrusion under the fourth amendment, it would make no sense to require one set of officers to enter, pursuant to a warrant, and then to require them to call for outside help whenever a suspicious item was located in a drawer. Arguably, the disruption to the premises would have been greater if the warrant-directed search had been interrupted for such a purpose; the extra time involved, and the annoyance caused by the movement of officers in and out, would have worked against, not in favor, of Mr. Crowder's privacy concerns.

■ Moreover, it is well established that an officer engaged in a lawful search is not required to interrupt the same to procure a warrant to seize evidence which he has come across in the course of looking for items in the warrant. *Green*, 474 F.2d at 1390 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968)). To the same effect, where an officer comes across items not listed in the warrant, it would serve no identifiable interest to require him to call for outside help to ascertain the nature of the discovered item, if that expertise can be close at hand in the form of other law enforcement officers.

We note, as well, that the case for defendants is made even stronger here by the fact that all of the officers were engaged in the investigation of a related series of burglaries. If the entry in, *e.g.*, *Roberts*, of an officer from a different jurisdiction to view evidence of a totally unrelated crime (entry to find television set, federal officers called when gambling paraphernalia located) is justified without an additional warrant, then surely the presence of additional officers who are investigating related burglaries has no constitutional ramifications.

### 3.

Thus, as we have established, no fourth amendment violation was occasioned merely by the presence and participation of the officers who were not present primarily for the purpose of looking for items described in the warrant. We note, however, that the entry onto the premises and the opening of drawers and the like in search of the listed items is not the only "search" that arguably occurred for purposes of our fourth amendment inquiry in this case. There is ample evidence in the record that numerous items not listed in the warrant but seized from the premises were handled, physically examined, and moved about the premises in the process of the officers' determining whether the respective items had been stolen.

In *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Court held that although officers are lawfully on a premises to search for certain items, a separate and additional "search" occurs when they come across other items and move or handle them in such a way as to reveal materially identifying characteristics. *Id.* 480 U.S. at 324–25, 107 S.Ct. at 1152–53.[21]

> [T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance

20. Strictly speaking, the evidence shows that the officers charged with fourth amendment violations arrived a while after Adams and Aycock, who undeniably entered pursuant to the warrant. The time sequence thus is similar to that in *Green, Brand,* and *Roberts.*

21. *See United States v. Lovell,* 849 F.2d 910, 915 (5th Cir.1988).

that validated the entry.... [T]he distinction between 'looking' at a suspicious object in plain view and 'moving' it even a few inches is much more than trivial for purposes of the Fourth Amendment.

*Id.* at 325, 107 S.Ct. at 1152.

The Court acknowledged that such an additional search would not violate the fourth amendment unless it were unreasonable. The Court squarely held that the search would not be *per se* unreasonable merely because certain actions taken were not in furtherance of the justification for entry onto the premises. *Id.* In so doing, the Court was merely recognizing that "the 'plain view' doctrine can legitimate action beyond [the] scope ... of the primary search itself." *Id.* at 325–26, 107 S.Ct. at 1152–53.

The Court concluded that the additional search at issue was valid if the plain view doctrine, as enunciated in *Coolidge v. New Hampshire,* 403 U.S. at 465, 91 S.Ct. at 2037, would have countenanced a seizure of the items at issue. Most importantly, the Court announced that the test for successfully invoking the plain view doctrine is whether the officer or officers effecting the supplemental search had not only reasonable suspicion, but "probable cause to believe that the equipment was stolen." 480 U.S. at 326, 107 S.Ct. at 1153. The Court reasoned that the probable cause requirement thus applies to both the search and the seizure. *Id.* at 328, 107 S.Ct. at 1154.

In the case *sub judice,* there thus must be a determination of whether there was probable cause [22] to examine ("search") and seize the items not shown on the warrant. The record before us does not permit that determination on appeal. As many items were examined and seized, there arguably were fourth amendment violations as to all, some, or none.

The question as to each item is whether there was probable cause to "search" it (by handling or examination) when it was initially seen but before it was moved. Under *Hicks,* even close examination of an item discovered in plain view cannot constitute a search: "Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest." *Id.* at 325, 107 S.Ct. at 1152.

█ If, for example, a drawer is opened (in pursuit of an item listed in the warrant) and items appear in plain view such that their visible characteristics give the viewing officer probable cause to believe they are stolen, no additional search has occurred, and those items may be seized. In the event that an officer who is present only to look for items in the warrant happens to find items as to which he has no probable cause, he may call for or receive the collective assistance of the other officers who are lawfully on the scene under the rationale of, *e.g., Green, Brand, Roberts,* and *Vance.*[23]

█ Certain of the seized items, however, may have been moved or handled before any determination was made as to whether there was reason to seize them. Under *Hicks,* additional information gleaned from the items by virtue of their being touched or moved may not be used to establish probable cause. The test there would be whether collectively the officers on the scene would have had probable cause to seize those items based upon what was visible when the objects were first seen.

---

**22.** In defining "probable cause" in this context, the Supreme Court has observed that it "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 ... (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

**23.** *See, e.g., United States v. Johnston,* 784 F.2d 416, 420 (1st Cir.1986) (evidentiary value of items can be determined by the shared knowledge and experience of the officers who are lawfully on the premises); *United States v. Newton,* 788 F.2d 1392, 1395 (8th Cir.1986).

There is a middle category which *Hicks* does not specifically address. Conceivably there were items, not listed in the warrant, that were moved, touched, or disturbed not in an effort to examine them, but in a reasonable effort to pick up, move, or seize either items listed in the warrant or objects as to which there was probable cause when those objects were first discovered. In a hypothetical case, for example, a silver tray listed in a warrant might be found in a drawer but under other items such as silver serving pieces, watches, and jewelry. If in removing the tray from the drawer an officer disturbs the other items so as to reveal further identifying information (e.g., initials on the back of a watch), the movement of the other items should not be considered an additional "search" under *Hicks*. This is because *Hicks* holds only that "taking action, *unrelated* to the objectives of the authorized intrusion, ... did produce a new invasion." 480 U.S. at 325, 107 S.Ct. at 1152 (emphasis added). Efforts to remove or examine items listed in the warrant would constitute actions taken pursuant to the warrant and thus would not amount to an additional search for which probable cause would be required.

### B.

The defendants assert that the district court erred as a matter of law in holding that they were not entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1980). We agree.

### 1.

As an initial matter, we must identify the standard of review to be applied. The jury returned a finding that none of the individual defendants proved that he "neither knew nor reasonably should have known that the action he took would have violated the clearly established rights of a plaintiff under the Constitution or laws of the United States of America." In its memorandum opinion denying the defendants' motion for a j.n.o.v. or new trial, the court agreed with the jury's finding but expressed some uncertainty as to whether the issue was to be decided by the jury or the court.

The defendants, citing *Stein v. Board of the City of New York*, 792 F.2d 13 (2d Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986); *Donta v. Hooper*, 774 F.2d 716 (6th Cir.1985), *cert. denied*, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987); and *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir.1985) (en banc), contend that the question of whether they are entitled to qualified immunity is one of law to be decided by the court. Accordingly, they reason that we should engage in *de novo* review of the district court's conclusion that they are not entitled to qualified immunity.

The record reveals, however, that far from objecting to the submission of this issue to the jury, it was the defendants who, over the plaintiffs' objection, requested that the interrogatory on qualified immunity be given to the jury. It is only now, after they have obtained a jury verdict that they are not entitled to qualified immunity, that defendants contend that the issue is one of law, not fact. Under these circumstances, where a party has not only acquiesced in the submission of an issue to the jury, but actually requested that it be so submitted, we refuse to entertain an argument that we should nonetheless review the verdict *de novo*.[24]

### 2.

After reviewing the evidence, we nonetheless conclude that the district court

---

**24.** See *City of Springfield v. Kibbe*, 480 U.S. 257, 259, 107 S.Ct. 1114, 1116, 94 L.Ed.2d 293 (1987) (per curiam) (refusing to consider challenge to jury instruction accepted and requested by petitioner); Fed.R.Civ.P. 51 ("No party may assign as error the giving ... of an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *cf. Melear v. Spears*, 862 F.2d 1177, 1184 n. 7 (5th Cir.1989) (where a § 1983 defendant fails to object to the submission of the qualified immunity issue to the jury, and the verdict is attacked for insufficiency of the evidence, the jury's determination of objective legal reasonableness under *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), is reviewable under the same standard as any other jury determination).

erred in denying the individual defendants' motions for a directed verdict and j.n.o.v. on the ground of qualified immunity. Even if, as the plaintiffs assert, their actions may have run afoul of the fourth amendment, we conclude that no reasonable jury could have concluded that a reasonable officer would have known, in 1981, that those actions violated clearly-established law. *See Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039.

For the most part, the facts are not in dispute. We assume, as did the district court, that reasonable officers acting in good faith would have believed that they had a valid warrant to enter Crowder's office and perform a search for the items listed in the warrant. Moreover, all of the physical and temporal aspects of the search were within the confines of the warrant: The officers searched only where it would be reasonable to find the items listed in the warrant and, never having found all of the items listed in the warrant, had the right to search for as long as they did.

Finally, the actions of the individual defendants are not in substantial dispute. For the most part, they lacked knowledge of the contents and scope of the warrant and were, by their own admission, on the premises to look for and identify stolen property not listed in the warrant. This was accomplished primarily by following the Texas officials and Crowder around the office as they executed the warrant by opening drawers, file cabinets, and other containers, with Crowder at times pointing out property he had purchased from the burglary suspects; in nonlegal terms, the defendants simply identified stolen property, often from lists acquired for that purpose, as it came into view.

Regardless of whether we consider the alleged violation of the Crowders' fourth amendment rights to have been the fact that officers who were without knowledge of the warrant assisted in the search, or the fact that items not listed in the warrant were seized, we conclude that a reasonable officer would not have known in 1981 that the defendants' actions violated clearly-established law. Although the district court

and the Crowders sought to characterize the defendants' actions as an unlawful "general, exploratory search" undertaken without regard to the limits of the warrant, *see Creamer v. Porter,* 754 F.2d 1311 (5th 1985) we do not believe that the defendants' actions can be so neatly and simply characterized.

As noted above, the physical and temporal aspects of the search were conducted in compliance with the limitations imposed by the warrant. In *Creamer,* we held that police officers who continued to search after they had discovered and seized all of the items listed in the warrant, and searched in places where it would be unreasonable to find such items, were not entitled to qualified immunity:

A general, exploratory search through personal belongings is the precise evil sought to be eliminated by the Fourth Amendment's requirement that things to be seized and places to be searched be described with particularity.... Under no circumstances could the officers justify their intrusion into an area such as a desk drawer, a filing cabinet or a nightstand to search for a television set. There was no conceivable justification for the officers to continue the search after the items described in the warrant had been seized.

*Id.* at 1318–19. To the contrary, the search in this case simply did not exceed the scope of the warrant. *In other words, precisely the same search would have been authorized and conducted had the defendants not accompanied the Texas officers to the premises.* The facts thus do not support the characterization of the defendants' actions as constituting a proscribed "general" search undertaken without regard to the warrant.

The Crowders forcefully argue, however, that the defendants' participation in the search was not pursuant to the warrant for the simple reason that, as the jury found, they were intentionally searching for and seizing items not listed in the warrant. It is undisputed, however, that the defendants were accompanying officers who were validly executing the warrant, and

that their actions consisted primarily of identifying property as stolen once it came into view during the course of the search. We thus come to what we believe is the heart of the qualified immunity issue in this case: Was it clearly unlawful for the defendants to assist in the search for the purpose of identifying, for seizure under the "plain view" doctrine, property that was not listed in the warrant?

We conclude that the answer to this question can only be "no." It was not until 1987 that the Supreme Court held, in *Arizona v. Hicks*, that probable cause is required, under circumstances such as these, before items not set forth in a warrant may be moved and seized. In sum, as of 1981 a reasonable police officer would not have known that it was a violation of the Crowders's fourth amendment rights to participate purposefully in a search, notwithstanding lack of knowledge regarding the contents of a warrant, by looking in otherwise concealed areas for and identifying stolen property not described in the warrant during an otherwise lawful search encompassing the same areas for stolen items listed in the warrant.[25] Because the individual defendants thus were entitled to qualified immunity, the district court erred in denying their motions for a directed verdict or j.n.o.v.

**25.** Moreover, what caselaw did exist at the time, all of it coming from the courts of states far removed from Texas and Arkansas, indicated that it was permissible for officers to be accompanied by victims, informants, or other persons familiar with the case for the purpose of identifying property turned up during a search but not listed in the warrant. *See generally* 2 W. LaFave, *Search & Seizure* § 4.11(c) at 343 (2d ed. 1987) (collecting cases).

**26.** The court instructed the jury that
[a] peace officer seeking to justify the seizure on the basis of that [sic] the item seized was in plain view must prove by a preponderance of the evidence the following: (1) that his intrusion onto the premises was lawful, because he entered the premises pursuant to a valid search warrant; (2) that the item seized was discovered or observed by him or other peace officers only inadvertently; and (3) that it was immediately apparent to the peace officer that the item seized was stolen property, evidence otherwise connected with criminal activity, or contraband. (In this connection, 'inadvertent' means accidental or unintention-

## C.

### 1.

The defendants also assert that the district court erred in instructing the jury that they bore the burden of proving by a preponderance of the evidence that the seized items fell within the "plain view" exception to the warrant requirement of the fourth amendment.[26] Applying the long-standing rule that the plaintiff bears the burden of proving each essential element of a claim, we agree that the court erred in placing upon the defendants the burden of proof on this issue.[27]

The elements of a section 1983 claim are well established. "[T]o recover under [section 1983] the Plaintiff must prove two vital elements: (1) that he has been deprived of a right 'secured by the Constitution and the laws' of the United States; and (2) that the persons depriving him of this right acted 'under color of any [state] statute'...." *Daniel v. Ferguson*, 839 F.2d 1124, 1128 (5th Cir.1988) (citing cases). In the context of claims based upon a deprivation of fourth amendment rights, the burden of proof on these elements is equally well-established: The plaintiff must prove the existence of each element by a preponderance of the evidence.[28]

al.) If these requirements are not met, the seizure of such an item is not lawful.

**27.** Of course, in a *criminal* case the *government* would have the burden of proving the facts that justify an exception to the warrant requirement. *See United States v. Berick*, 710 F.2d 1035, 1037 (5th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983); 2 W. LaFave, *supra*, § 11.2(b) at 218.

**28.** *See Hand v. Gary*, 838 F.2d 1420, 1424 (5th Cir.1988) ("We deal with both constitutional theories [malicious prosecution and false arrest], and find that under each theory, ... Plaintiff failed to prove a constitutional violation."); *Gilker v. Baker*, 576 F.2d 245, 246 (9th Cir.1978) ("To prevail [in a section 1983 action based upon illegal arrest], such a plaintiff must show that the arrest was without warrant or other justification."). *Cf. Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir.1985) ("A prerequisite to recovery under [§ 1983] is that the plaintiff prove that the defendants deprived him of a right secured by the Constitution and the laws

In their complaint, the Crowders alleged a deprivation of their fourth amendment rights, specifically, their right to be free from unreasonable searches and seizures. At least as a general matter, therefore, to prevail under section 1983, it was incumbent upon them to prove by a preponderance of the evidence that the search of Crowder's office and the seizure of their property was "unreasonable," as that term is understood in the context of the fourth amendment. The Crowders argue that they met their burden by demonstrating that the presumption of reasonableness arising from the issuance of a valid warrant attached to only four of the forty-six items seized, the other forty-two items seized not being listed in the warrant. At that point, they contend, the burden of proof rested upon the defendants to show that the seizure of the items not described in the warrant was justified under one of the exceptions to the warrant requirement of the fourth amendment.

We do not agree. Such a holding would effectively negate the general rule that a plaintiff in a section 1983 action alleging a deprivation of fourth amendment rights bears the burden of proving that a violation of his or her rights has indeed occurred. The fourth amendment is not violated merely because the state officials lack a warrant to arrest someone or to perform a search and seizure; to the contrary, a considerable body of law is devoted to the proposition that, in a specified set of situations, arrests, searches, and seizures of property are "reasonable" under the fourth amendment, notwithstanding the fact that the officials have not obtained a warrant authorizing their actions.

Because of the diverse and frequent interaction between the police and the public, these exceptions to the warrant requirement come into play in a variety of circumstances. A warrantless arrest based upon a police officer's judgment that he or she has probable cause to believe that a crime is being committed in the officer's presence, for example, is a frequent basis for

section 1983 claims. *See, e.g., Gassner v. City of Garland,* 864 F.2d 394 (5th Cir. 1989) (citing cases). Similarly, plaintiffs also commonly challenge warrantless searches and seizures that state officials contend are justified under one of the recognized exceptions to the warrant requirement. *See, e.g., Anderson v. Creighton; Melear v. Spears; Creamer v. Porter.* The point we make is this: Although section 1983 plaintiffs often challenge the validity of arrests, searches, and seizures carried out pursuant to a warrant, they also commonly challenge *warrantless* arrests, searches, and seizures.

In light of this fact, we cannot agree that the burden of proof in a section 1983 case based upon an alleged fourth amendment violation should be shifted to state officials once the plaintiff establishes that the officials' actions were not authorized by a warrant. The plaintiff has alleged, and must prove, that the state officials have committed a wrongful act; both law and common sense instruct us that the police, in a great number of cases, do not commit such a wrongful act merely because they act without a warrant. In some such cases, a fourth amendment violation does occur—but it is because the police act without a warrant, *and* without authorization under one of the exceptions to the warrant requirement, that such a violation occurs.

This result is arguably dictated by our own cases. In *Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986), a section 1983 plaintiff alleged that his fourth amendment rights were violated when he was arrested without a warrant and without probable cause. Our allocation of the burden of proof on the issue of whether there was probable cause to support his warrantless arrest is unmistakable:

> To prevail on a section 1983 claim for false arrest the plaintiff must prove that the officer made the arrest without probable cause.

of the United States."); *Clark v. Mann,* 562 F.2d 1104, 1117 (8th Cir.1977) ("Where, as here, suit is brought pursuant to 42 U.S.C. § 1983, plain-

tiffs ordinarily retain the burden of proof throughout the trial" (citing cases)).

*Id.* at 1266 (citing *Vela v. White,* 703 F.2d 147 (5th Cir.1983), and *Trejo v. Perez,* 693 F.2d 482 (5th Cir.1982)).[29] Plaintiffs have not offered us, and we cannot perceive, any reasons to adopt a different rule in the case of a warrantless search. We thus hold that the burden of proof on the issue of whether the items seized were in plain view rests on the plaintiff in a section 1983 action based upon a warrantless search which defendants seek to justify under that exception to the warrant requirement.

### 2.

Moreover, in light of the foregoing discussion regarding the fourth amendment issues, we determine that some refinement is needed in the submission of those issues to the jury. As to the items not listed in the warrant, the defendants invoke the plain view exception enunciated in *Texas v. Brown,* 460 U.S. at 737, 103 S.Ct. at 1540. Recently, we interpreted the elements of the plain view exception to be as follows:

1. The officer must lawfully make an initial intrusion or otherwise properly be in a position from which he can view a particular area;

2. The officer must discover incriminating evidence "inadvertently," i.e., he may not know in advance the location of certain evidence and intend to seize it under the pretext of the plain view doctrine; and

3. It must be "immediately apparent" to the officers that the items they observe may be evidence of crime, contraband, or otherwise subject to seizure.

*United States v. Espinoza,* 826 F.2d 317, 318 (5th Cir.1987).[30]

**29.** *But see Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985) (stating, without citation to authority, that in a § 1983 case alleging an unlawful warrantless arrest, the burden of proof on the issue of probable cause is on the defendant).

**30.** In *Texas v. Brown,* the plurality opinion, 460 U.S. at 737, 103 S.Ct. at 1540, accepts as a "point of reference" the plurality's view in *Coolidge v. New Hampshire* that inadvertence is required for invocation of the plain view doctrine. One concurring Justice noted specifically that the inadvertence requirement had never received

We have held here that as a matter of law, the entry of all of the officers onto the premises was lawful. Thus, the first element of the plain view exception has been met.

The element of inadvertence must be determined on remand. On that element, the district court instructed the jury as follows:

Inadvertence is not shown, if a peace officer knew in advance the location of any such item and intended to seize it. On the other hand, such peace officer need not be totally surprised by the discovery of the item seized, for the discovery to be inadvertent; the discovery of such an item can be within the realm of foreseeable possibilities or even expected. In short, for the discovery of an item not listed in the warrant to be inadvertent, a peace officer must have lacked probable cause to believe the item would be discovered and must not have arrived with the intent of conducting a search for it.

This instruction was in error in requiring that the officer "must not have arrived with the intent of conducting a search for [an item not listed in the warrant]." The subjective intent of the officers is irrelevant; the test, as the jury was instructed, is whether the "officer knew in advance the location of [the] item," not whether he intended to look for it, on the possibility that it might be found, while he was lawfully on the scene. Thus, where, as here, the initial intrusion is made pursuant to a legitimate investigation and not solely as a subterfuge to gain entry, the fact that other officers are looking for other items has no fourth amendment ramifications.[31]

the endorsement of a majority. *Id.* 460 U.S. at 744, 103 S.Ct. at 1544 (White, J., concurring). In *Espinoza,* however, we read *Texas v. Brown* as imposing the requirement. *Espinoza* thus expresses the law of the circuit in this regard.

**31.** *See e.g., United States v. Washington,* 797 F.2d 1461, 1471 (9th Cir.1986) (fact that the search conducted pursuant to the warrant was "a 'serious valid [ ] investigation'" is enough to defeat a claim of subterfuge) (quoting *United States v. Hare,* 589 F.2d 1291, 1296 (6th Cir. 1979)); *United States v. Kimberlin,* 805 F.2d 210, 229 (7th Cir.1986) ("Although the offenses indi-

■ The third element of the plain view exception—that it be "immediately apparent" that an item is subject to seizure—stems directly from the rule, explained in *Arizona v. Hicks*, that the officer, or, collectively, the officers, have probable cause as to the item. The district court, correctly noting the prerequisite of probable cause, charged the jury on the "immediately apparent" element:

For the inadvertent seizure of an item not listed in the sworn application for the search warrant to be valid, it must also be immediately apparent to a peace officer participating in the search that the item seized is stolen property, evidence otherwise connected with criminal activity, or contraband. It is not necessary that a peace officer *know* that a certain item is contraband or evidence relating to a crime; he need only have probable cause to believe that the item seized is stolen property, evidence otherwise connected with criminal activity, or contraband. A seizure of an item not listed in the sworn application for a search warrant is not justified, if its character as such stolen property, evidence, or contraband becomes known only after close inspection. Only a brief inspection of an item in plain view is permissible, to determine whether there is probable cause to believe such item is stolen property, evidence otherwise connected with criminal activity, or contraband; and, in such circumstances, the peace officer must first have at least a reasonable suspicion that such is its character.

In light of *Hicks*, the last two sentences of this instruction are inappropriate. Nothing in *Hicks* suggests that officers may not carefully, meticulously, and "closely" inspect those portions of an item that are in plain view. For example, the Court noted that the careful "recording of the serial numbers did not constitute a seizure." 480 U.S. at 324, 107 S.Ct. at 1152. Rather, under *Hicks* the fourth amendment concerns turn on whether the items are moved or disturbed so as to bring additional characteristics into view, not on whether the portions already visible are examined "closely."

Nor do we find any justification for the restriction that "[o]nly a brief inspection of an item in plain view is permissible." Again, *Hicks* appears to sanction lengthy inspection of whatever is in plain view. Finally, *Hicks* replaces a "reasonable suspicion" requirement with its "probable cause" analysis. *Id.* at 326, 107 S.Ct. at 1153. Thus, "reasonable suspicion" disappears from the analysis in light of *Hicks;* there is no basis for concluding that an officer must first have reasonable suspicion before he can look at an item to determine the existence of probable cause.

## IV.

■ The governmental units held liable for the fourth amendment violations found to have been committed by their employees—Miller County, Sevier County, and the City of DeQueen—contend that the district court erred in refusing their motions for a directed verdict or j.n.o.v. We conclude that the court did not err. However, because the governmental defendants cannot be held liable unless their employees have violated the Crowders' fourth amendment rights, and we have vacated the judgment on that claim, those three governmental defendants are entitled to a new trial on the issue of whether a fourth amendment violation occurred.

At trial, the Crowders sought to hold those defendants liable under the theory that the unconstitutional acts were committed by policymaking officials in the area of law enforcement and therefore constituted the official policies of the governmental units. After being instructed on this theory[32], the jury found, in response to special interrogatories, that the actions of Miller County Sheriff Sinyard and Sevier County Sheriff Godwin "represented the official polic[ies]" of their respective employers.

cated in the first warrant were only misdemeanors, they were not trivial, and the FBI had a legitimate interest in pursuing them.").

32. The defendants also contend that the court's instructions constitute reversible error. We consider this argument *infra.*

As to the actions of DeQueen Chief of Police Jones, the jury found that they "were purusant to an official policy" of the city. We review these findings under the standard of review enunciated in *Boeing Co. v. Shipman. See supra.*

In *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion), Justice O'Connor articulated several guiding principles to be used in determining "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." Drawing upon Justice Brennan's opinion in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), Justice O'Connor wrote,

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.' ... Second, only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.... Third, whether a particular official has 'final policymaking authority' is a question of *state law....* Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

108 S.Ct. at 924 (quoting *Pembaur,* 475 U.S. at 480, 483, 106 S.Ct. at 1298, 1299 (plurality opinion)) (emphasis in original). A majority of the Court recently adopted the *Praprotnik* formulation in *Jett v. Dallas Indep. School Dist.,* —— U.S. ——, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).[33]

### A.

Miller County and Sevier County both argue that, far from constituting "official policy," the actions of Sheriffs Sinyard and Godwin represent "the mere exercise of dicretionary judgment by such Sheriffs in an area in which they were given no policymaking authority by state law." The es-sence of their argument is that, under Arkansas law, neither official was given responsibility for determining the county's policy regarding the actions of county police officials outside the jurisdiction of the county.

We find this argument to be meritless. Under Arkansas law, a county sheriff, in the execution of the statutory duty to perform law enforcement activities in and for the county, *see* Ark.Stat.Ann. §§ 14–14–1301(a)(5), 14–15–501, is solely responsible for the procedures and practices of the department; there is no legislative or other higher body, beyond a court of law, to which the sheriff answers. Although Miller and Sevier Counties may be correct in suggesting that a sheriff's legal authority as a peace officer—e.g., the authority to execute search warrants or to arrest suspects—ends at the county line, this case illustrates that a sheriff's activities, and those of subordinates, are not similarly constrained by geography. Indeed, the Arkansas officials' testimony in this case indicates that they believed that their presence at the search was in furtherance of their official duties: to investigate the burglaries in their respective jurisdictions and to assist in the identification and recovery of property stolen in those burglaries.

Part and parcel of a sheriff's duties under Arkansas law, therefore, is to establish policies and procedures covering the conduct of departmental officers when they cooperate with, or perform actions in conjunction with, officials from outside the county. To accept the counties' argument on this point would be to hold that when a member of the sheriff's office—or, as in this case, the sheriff—crosses the county line, he or she is beyond the authority and control of the county, even if the officer's actions are in furtherance of official duties and sanctioned by the highest county official with policymaking responsibility for law enforcement. This we cannot do.

■■■ In sum, we conclude that the jury had an ample basis upon which to conclude that Sheriffs Sinyard and Godwin were the

---

33. A thorough discussion of *Pembaur* and *Praprotnik* appears in our recent opinion in *Wors-* *ham v. City of Pasadena,* 881 F.2d 1336, 1338–40 (5th Cir.1989).

"final policymaking authorit[ies]" with regard to the actions of their respective counties' law enforcement officials' activities outside their jurisdictions and that they were authorized and responsible under Arkansas law for establishing policies and procedures regarding such activities. The district court properly denied the two counties' motions for directed verdict or j.n.o.v.

### B.

■ The city of DeQueen contends that it cannot be held liable because Chief of Police Jones was not the "final policymaking authority" with regard to the city's law enforcement activities. We conclude that the jury was free to make a contrary finding.

Unlike county sheriffs, city police chiefs in Arkansas derive their authority from the city's elected officials or, as in the case of DeQueen, the city manager. *See* Ark.Stat. Ann. § 14–52–203(a) ("The duty of the chief of police and other officers of the police department shall be under the direction of the mayor."); § 14–47–120 (The city manager possesses "all powers, except those involving the exercise of sovereign authority ... vested in the Mayor."). The formal subservience of the Chief of Police to city officials is underscored by the ability of those officials to abolish the office outright. *See Ellis v. Allen*, 202 Ark. 1007, 154 S.W.2d 815 (1941).

Notwithstanding that fact, Jones's uncontradicted testimony, indicates that the city manager delegated all power regarding the city's law enforcement activities to Jones.

He testified that he makes "all policies and procedures and ha[s] full supervisory capacity over all [DeQueen police] officers," and that, except as to the department's budget, city officials exercise no control over the department's activities, policies, or procedures. In *Worsham*, 881 F.2d at 1340, we noted, in applying *Pembaur* and *Praprotnik*, that municipal liability may be incurred where there has been a "complete delegation of power" to an official charged with a constitutional violation. Under these circumstances, the jury had an ample basis upon which to conclude that, by delegating all control over the police department to Jones, the city had vested him with "final policymaking authority" in this area, and therefore that Jones's actions were pursuant to, and constituted, official municipal policy in accordance with the reasoning of *Pembaur, Praprotnik,* and *Jett*.[34]

### V.

The defendants have urged several other issues on appeal; it is likely that the district court will have to confront at least two of those issues again on remand.[35] Lest the court's rulings on these matters be the subject of yet another appeal, we address them now.

### A.

### 1.

■ The governmental defendants first contend that the court erred in instructing the jury on the issue of governmental liability. The court instructed the jury, *inter alia,* that

**34.** *See Praprotnik,* 108 S.Ct. at 928; *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.) (en banc) (stating that an "official policy" may be made by the municipality's "lawmaking officers" or "by an official to whom the lawmakers have delegated policy-making authority"), *modified,* 739 F.2d 993 (5th Cir.1984) (en banc); *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987) (same). The governmental defendants did not argue in the district court, and do not assert on appeal, that they were entitled to a directed verdict under the fourth *Praprotnik* principle, that "the challenged action must have been taken *pursuant to a policy* adopted by that official." *Praprotnik,* 108 S.Ct. at 924 (plurality opinion) (emphasis added). We thus do not ex-

press any view on this issue, which can be considered by the district court if the governmental defendants elect to raise it.

**35.** The defendants also challenge several of the district court's rulings regarding the admissibility of evidence showing what the officers knew regarding the burglaries and stolen property that did not form the basis for the warrant. Although the district court initially refused to permit the defendants to introduce such evidence, it later reconsidered its ruling midway through trial and admitted the same. Given the district court's reconsideration of its rulings, we think it unnecessary to address this issue.

[c]ertain elected officials, such as a sheriff or a district attorney, are not answerable to the governing body of the county which they represent. By virtue of their powers under state law, they are responsible only to the voters who elect them for the particular tasks or areas of responsibility which are assigned to them by law. Such elected officials are the final authority of county power in those tasks or areas of responsibility and are policymaking officials whose actions represent official policy of that county.

The defendants objected to this instruction and requested that, if it were given over their objection, the following language be added:

They are, however, only to be considered policymaking officials of their counties with respect to the particular areas of responsibility which are specifically assigned to them by state law.

The district court overruled the objection and rejected the proffered language.[36]

This matter should not have been presented to the jury in the first place. "Under the *Praprotnik* plurality view, the existence of final policymaking authority is a question of state or municipal law, not of fact ..., [and] we are compelled to follow [that] plurality opinion." *Worsham*, 881 F.2d at 1340 n. 8. Hence, on remand the district court, and not the jury, should decide whether the respective officers have "final policymaking authority" under state law concerning the actions at issue. *See Jett*, 109 S.Ct. at 2723. Only after "those officials who have the power to make official policy on a particular issue have been identified" should the jury be asked to determine "whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur," *id.*, "or by acquiescence in a long-standing practice or custom which constitutes ... standard operating procedure.... *Id.* (emphasis in original) (citing *Pembaur*, 475 U.S. at 485–87, 106 S.Ct. at 1301–02 (White, J., concurring)).

**2.**

■ Regarding the cross-appeal, we affirm the j.n.o.v. entered in favor of the City of Texarkana. In their appellate brief, the Crowders identify two policies of the city that they assert caused city employees to act unconstitutionally: "(1) a policy of cooperating with out of state law enforcement officers in police investigations ... and (2) a policy of relying on the district attorney's office for guidance and assistance...." The Crowders acknowledge that these alleged policies were not themselves unconstitutional but that the asserted unlawful acts were perpetrated pursuant to those policies.

The Crowders contend that a municipality may be held liable even for *constitutional* policies pursuant to which its employees commit unconstitutional acts. In a recent pronouncement on municipal liability, the Supreme Court has agreed with this general proposition: "[W]e reject [the] contention that only unconstitutional policies are actionable under [section 1983]." *City of Canton v. Harris*, ──── U.S. ────, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). There, the Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (footnote omitted).

The instant plaintiffs do not assert inadequate training, and the Court has not yet indicated whether inadequate training is the only area in which a city can be liable for a policy that is not itself unconstitutional. But the Court has reiterated that "a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *Id.* 109 S.Ct. at 1205 (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445,

---

**36.** Because a different set of instructions covered the City of DeQueen's liability for the actions of Chief of Police Jones, our review of this question relates only to Miller and Sevier Counties.

454, 70 L.Ed.2d 509 (1981)) (brackets in original).

There is nothing in the record before us that indicates that any policies of the City of Texarkana reflected deliberate indifference to any constitutional concerns or were anything other than generic policies favoring effective law enforcement. Such general policies cannot be read as the "moving force" behind any asserted unconstitutional acts. To find municipal liability "on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell,* [436 U.S. at 693–94, 98 S.Ct. at 2037–38]...." *City of Canton v. Harris, id.* 109 S.Ct. at 1206. Thus, the City of Texarkana may not be held liable on the facts before us.[37]

### B.

■ The defendants also contend that the district court erred in refusing to submit an interrogatory to the jury asking whether it found "from a preponderance of the evidence that Plaintiff J.R. Crowder was guilty of negligence or any other breach of duty which was a proximate cause of any of the injuries" sustained by him or his wife. The defendants contend that, in numerous instances, Crowder's own actions—such as buying allegedly stolen property in the first place, identifying property in the office as having been bought from the alleged burglars, and failing to keep records of his own property so he could determine what he had lost—caused his injuries, and that the jury should have been allowed to find him wholly or partially at fault.

For a number of reasons, we find no error in the rejection of this interrogatory. First, the interrogatory, unaccompanied by any instructions offered by the defendants, is so vague as to be virtually devoid of meaning. The defendants themselves present at least five completely different theories as to why Crowder may have been contributorily negligent, none of which is conveyed to the jury by the interrogatory. The district court properly refused to set the jury helplessly adrift in such uncharted waters.

Second, many of the defendants' so-called "theories" of contributory negligence are little more than argumentative responses to the elements of the Crowders' claims, most of which the defendants were free to argue, and the jury was free to consider, on the elements of causation and damages. We consider the defendants' arguments that Crowder's lack of property records caused the "loss" of his property, and that his physical injuries were the result of his own publicization of the case, for example, to fall into this category.

In sum, the defendants seem to have offered this interrogatory as a sort of "catch-all" question designed to allow the jury to return a verdict in their favor on the basis of any defense argument or theory that caught its fancy. But the purpose of jury instructions is to instruct, inform, and guide the jury in its deliberations; the interrogatory requested by the defendants serves none of those purposes. The district court did not err in rejecting it.

### VI.

In light of the fact that we have vacated the judgment of the district court, rendered judgment in favor of the defendants on one claim, and remanded for a new trial on the other claim, there is no basis upon which to award the Crowders attorneys' fees under 42 U.S.C. § 1988. At this stage of the proceedings, they simply have not prevailed on any significant issue in the litigation. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* —— U.S. ——, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). Thus, in vacating the judgment, we also vacate the award of attorneys' fees; hence, the appeal in No. 87–2455 is dismissed as moot.

---

**37.** We note, as well, that the City of Texarkana was found liable only for violating the Crowders' right of access to the courts. To this extent, our conclusion, *infra,* that there was no right-of-access violation is an alternative ground for upholding the j.n.o.v. in favor of the city.

## VII.

In summary, No. 88–2049, as to all of the individual defendants, and as to governmental defendant Bowie County, which was held liable only on the right-of-access claim, the judgment is VACATED, and the case is REMANDED for the entry of judgment in their favor. As to governmental defendants Miller County, Sevier County, and the City of DeQueen, the judgment is VACATED, and the case is remanded for a new trial only on the issue of whether the governmental units' officials violated the Crowders's fourth amendment rights, pursuant to policy, and the issue of damages, if any. In the cross-appeal concerning the City of Texarkana, the judgment is AFFIRMED. In No. 87–2455, the appeal is DISMISSED as moot.