Kenneth Ray WILLIAMS, Appellant,

v.

Karen Howell KNOTT, et vir.,
Appellees.

No. 14219.

Court of Appeals of Texas,
Austin.

Feb. 27, 1985.

Rehearing Denied May 8, 1985.

Thomas M. Goff, San Angelo, for appellant.

Terry R. Norman, Brady, for appellees.

Before SHANNON, C.J., and EARL W. SMITH and BRADY, JJ.

BRADY, Justice.

This is an appeal by Kenneth Ray Williams from a decree of the trial court terminating his parental rights and granting the adoption of his daughter by the step-father, appellee, James M. Knott, III. This Court will reverse the judgment of the district court.

Kenneth and Karen were divorced by the district court of Custer County, Oklahoma, in March 1979. Karen was awarded custody of their only child, Jamie Dee Williams, who was then eighteen months of age. In October 1981, Karen married James Knott and moved to Brady, Texas, with the child. Suit for termination and adoption was filed in the district court of McCulloch County in February 1983, at which time appellant was residing and domiciled in Oklahoma. Appellant filed a special appearance under Tex.R.Civ.P. 120a asserting that the Texas courts did not acquire personal jurisdiction over him, and that the Oklahoma court had continuing jurisdiction involving these parties. The trial court overruled the special appearance and after a trial on the merits, terminated appellant's parental rights and granted the Knotts' petition for adoption.

Appellant asserts eight points of error, including the overruling of his jurisdictional challenge, and contending the trial court's termination of his parental rights was an abuse of discretion and was not supported by clear and convincing evidence. The trial court's findings of fact and conclusions of law state that appellant failed to support his child in accordance with his ability during a period of one year ending within six months of the date of the petition of termination, and that such termination was in the best interest of the child.

## JURISDICTIONAL QUESTION

Appellant, as a resident and domiciliary of Oklahoma, argues that the courts of Texas did not acquire personal jurisdiction over him to terminate his parental rights. Due process considerations, appellant urges, require that a state court be limited in its authority to enter judgments affecting rights or interests of nonresident defendants, citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); and *Kulko v. Superior Court of California*, 436 U.S. 84, 90, 98 S.Ct. 1690, 1695, 56 L.Ed.2d 132 (1978). The Supreme Court of the United States has noted that the minimum contacts standard "cannot accommodate some necessary litigation," and recognized the need for exceptions, such as status adjudication. *Shaffer v. Heitner, supra.* Special jurisdictional principles thereby apply to status adjudications like custody.

In *Perry v. Ponder*, 604 S.W.2d 306 (Tex. Civ.App.1980, no writ), the court held that the nonresident parent's lack of personal contacts did not "outweigh the state's vital interest in the welfare of children residing within its borders." *Perry* at 314. The Court in *Perry* relied on section 11.051 of the Texas Family Code (Supp.1979) in holding that said section was intended to be an assertion of jurisdiction in the broadest sense consistent with due process. Thus, it was established that:

> If the notice requirements of due process and applicable procedural rules are met, a Texas court has "personal jurisdiction" over the nonresident within subdivision (4) of Section 11.051 to adjudicate the custody issue, even though it may not have such jurisdiction to render a personal judgment enforcing or imposing affirmative duties on the nonresident.

*Id.* at 313–314. Indeed, the court went further and said:

> ... the standard of traditional notions of fairness and substantial justice laid down in International Shoe and elaborated in Shaffer as the ultimate test of due process may be met in a child custody case by delivery of personal notice outside the state without any requirement of "mini-

mum contacts on the part of the absent parent."

*Id.* at 316. The *Shaffer* opinion, on the other hand, primarily stressed the relationship among the defendant, the forum, and the litigation. The *Perry* case seems to have stretched that relationship in favor of the forum state's interest in the litigation.

There exists little case authority involving termination of parental rights when the respondent is a nonresident of Texas. There is authority, however, to the effect that a termination proceeding is a status determination which does not require personal jurisdiction over a nonresident respondent. See Restatement (Second) of Conflict of Laws §§ 69–79 (1971). Additionally, footnote 30 in the *Shaffer* opinion could be read to support the above conclusion.

The Court in *In re M.S.B., D.G.B. and K.R.B.*, 611 S.W.2d 704 (Tex.Civ.App.1980, no writ) endeavored to answer the question of whether personal jurisdiction is required over a nonresident respondent in termination proceedings. The facts of that case are similar to the case at bar in that the petitioner filed a suit to terminate the parent-child relationship and to effectuate the adoption of the children by the petitioner's second husband. When the parties were divorced in West Virginia, the court appointed the mother managing conservator of the children, and ordered the father to make child support payments. Subsequently, the court entered an order modifying the father's visitation rights. Approximately one month later the mother moved with her children to Texas. About two and one-half years later the mother instituted a proceeding in Bexar County, Texas, to terminate the father's parent-child relationship and to effectuate the adoption of the children by the petitioner's second husband. The Court held that section 11.045 of the Texas Family Code (1979 Tex.Gen. Laws, ch. 584, § 2, at 1202), provided for an affirmative grant of jurisdiction. The issue in the case was whether the Texas court was required to exercise personal jurisdiction over the nonresident respon-

dent before termination of the parent-child relationship could be accomplished. The Court indicated that the rational in *Perry,* the clear implication in footnote 30 of the *Shaffer* opinion, and section 11.045 of the Texas Family Code allowed the case to be viewed as a question of status adjudication. Thus, there was no reason not to apply the rational in *Perry* to a termination proceeding.

Section 11.045 of the Texas Family Code was in effect when the appellant in the instant case filed his special appearance. Several months later, but before the decree of termination and adoption was signed by the judge, § 11.045 was repealed. Simultaneously, the Texas Legislature adopted the Uniform Child Custody Jurisdiction Act (UCCJA) under subchapter B of the Texas Family Code (Supp.1985). Section 11.53 of the Act was intended to fill the void left when § 11.045 was repealed. That section currently sets forth the manner and means whereby a court may acquire jurisdiction over a child where a custody issue is at stake. Additionally, § 11.-051 of the Texas Family Code was modified to allow status or subject matter jurisdiction in suits affecting the parent-child relationship, such as termination actions, to be based on the jurisdictional provisions contained in § 11.53 of the Texas Family Code. We find that appellee has complied with the jurisdictional provisions of § 11.53. The child and mother have resided in Texas for more than six months prior to the commencement of the termination and adoption suit. Tex.Fam.Code Ann. § 11.53(a)(1)(A) (Supp.1985). Moreover, appellee has complied with § 11.53(a)(2)(A) & (B) of the Texas Family Code (Supp.1985). No other state would have jurisdiction under subdivision (1) of subsection (a) of this section since Texas, and not Oklahoma, is the child's home state. Finally, the child and at least one contestant, the appellees, have a significant connection with this State; and there is available in this State substantial evidence germane to the child's best interest. It is uncontroverted that the father (appellant) was afforded notice and an

opportunity to be heard. Tex.Fam.Code Ann. § 11.54 (Supp.1985). Therefore, we hold that it was not error for the trial court in McCulloch County, to exercise jurisdiction in this matter. Appellant's first point of error is overruled.

■ Appellant's second point of error is that the trial court in McCulloch County, did not acquire jurisdiction in the termination proceeding due to Oklahoma's continuing jurisdiction under the UCCJA, and the Federal Parental Kidnapping Prevention Act, hereinafter the PKPA. Appellant reaches this conclusion by erroneously assuming that the *Perry* case holds that a termination proceeding is in effect a custody case. Since Oklahoma initially made a "child custody determination" consistent with the PKPA, appellant argues, Oklahoma acquired continuing jurisdiction under subsection (d) of the PKPA. Therefore, under subsection (g) the pending action in Oklahoma precluded a court in Texas from entertaining any action affecting the parent-child relationship. 28 U.S.C.A. § 1738A (Supp.1985). We do not address the issue of the validity of Oklahoma's continuing jurisdiction under either subsection of the PKPA, because actions to terminate parental rights are not child custody cases. *Richardson v. Green*, 677 S.W.2d 497 (Tex.1984).

In *Green, supra,* the court was construing Tex.Rev.Civ.Stat.Ann. art. 1821(3), which makes judgments of the Courts of Appeals final in child custody, support, and reciprocal support cases. The argument was proffered in that case that the Texas Supreme Court has no jurisdiction to hear an appeal of a termination case because art. 1821(3) makes judgments final in the Courts of Appeals. The Supreme Court rejected that construction and held that termination cases are appealable to the Texas Supreme Court. The Court's opinion makes it clear that there is a difference between custody suits and termination actions. *Id.* at 500. In making a critical distinction under art. 1821(3), the Court stated that, "If the legislature had intended the 1983 amendment to encompass 'all ac-

tions under Title 2 of the Family Code,' it would have stated: 'all cases of divorce, or suits affecting the parent-child relationship' instead of limiting the exclusion of jurisdiction to 'or child custody, support, or reciprocal support.'" *Id.* at 500. A similar analysis can be made in the instant case.

The PKPA is a federal mandate providing that all states shall enforce and not modify other states child custody determinations that are made consistently with the PKPA. Therefore, in order to determine whether Texas is in violation of the full faith and credit provisions of the PKPA we must ascertain the scope of the PKPA. We will address this issue from the standpoint of what the appellant argues in his brief.

Appellant strongly urges that Oklahoma's pending custody proceeding precluded Texas from exercising jurisdiction due to subsection (g) of the PKPA. Subsection (g) states, "A court shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another state where such court of that state is exercising jurisdiction consistently with the provisions of this section." 28 U.S.C.A. § 1738A(g) (Supp.1985). Thus, Texas may not engage in a "custody determination" if another court is exercising jurisdiction consistently with the provisions of this section. There are two reasons why subsection (g) of the PKPA was not violated in the instant case.

■ First, subsection (g) of the PKPA is applicable only where a state court is exercising jurisdiction consistent with the provisions of the PKPA. The Oklahoma action was not consistent with the provisions of the PKPA because Texas and not Oklahoma was the child's home state. *See Bolger v. Bolger*, 678 S.W.2d 194 (Tex.App. 1984, no writ).

■ Secondly, the statutory definition of "custody determination" contained in § 1738A(b)(3) of the PKPA states that "custody determination" means a judgment, decree, or other order of a court

providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications. Additionally, all the cases of which this Court is cognizant involve suits to modify custody or visitation, or suits involving initial divorce decrees providing for custody and visitation. Therefore, we do not read this section of the PKPA to subject suits affecting the parent-child relationship where the proceeding is in the form of a suit to terminate parental rights to the full faith and credit provision of the federal statute.

Likewise, Texas' termination proceeding is not a "modification" of Oklahoma's prior custody decree. Subsection (b)(5) of § 1738A defines "modification" and "modify" as "a *custody determination* which modifies, replaces, supersedes, or otherwise is made subsequent to a prior custody determination concerning the same child, whether made by the same court or not" (emphasis added). Thus, since a termination is not a custody determination, it certainly is not a modification in violation of the PKPA's full faith and credit proviso. Though § 11.51 of the Texas Family Code allows jurisdiction in termination cases to be based on § 11.53 of the Texas Family Code, that alone does not subject termination cases to the full faith and credit provision in the PKPA.

Accordingly, we hold that this suit to terminate the parent-child relationship is not subject to the full faith and credit provisions of the PKPA absent express statutory language to the contrary. Appellant's second point of error is overruled.

### EVIDENTIARY QUESTION

Appellant's next six points of error all complain that the termination of the parent-child relationship, which was based on erroneous findings and conclusions of the trial court that the termination was in the best interest of the child, was not proved by "clear and convincing" evidence and was an abuse of discretion.

The Oklahoma divorce decree provided for child support payments of one hundred dollars a month. Appellant made these monthly payments until his former spouse remarried and moved with the child from Oklahoma to Texas. He also exercised visitation rights with his daughter while his former spouse and daughter were living in Oklahoma. From October 1981, when the appellees moved to Texas, to January 1983, appellant paid no child support. There was testimony elicited on the cross-examination of appellee that she insisted appellant could not have visitation with his daughter unless he paid his child support. Further, testimony revealed that when appellant told his former wife that he was unable to pay because he had only worked four months in 1982 as a result of injuries he had received which caused the loss of his sight in one eye, that she told him that it was all right because "Jim makes enough money" and they "were not hurting for money." The divorce decree provided that the appellant was to make child support payments directly to appellee.

The thrust of appellees' testimony supporting termination and adoption was that the child was confused as to who her daddy was, and that granting the termination and adoption would end such confusion. Witnesses testified that the child was well-adjusted. Testimony indicated further that the child experienced no problems in school, or in her relationship with either natural parent. The fact that appellee refused to permit visitation unless appellant was current on his child support payments suggests a strong barrier to appellant's ability to have maximum contacts with his daughter. The record reveals that the Oklahoma court order contained a provision that appellant's visitation with his child was subject to his "staying current with his child support obligation." Certainly, any complaints by appellees concerning appellant's failure to exercise visitation rights would be excused by appellees' conduct in withholding such visitation rights as well as the provisions of the Oklahoma court order.

There was testimony that appellant had a "special relationship" with his daughter. The evidence disclosed that, despite his fi-

nancial problems, appellant always sent her gifts at Christmas, that he bought clothes for her when the child was returned to Oklahoma to visit appellant's parents, that he would take her fishing, and that when the child wanted to spend an extra week with her father last summer, she cried when she could not.

■ Termination is a drastic remedy and is of such weight and gravity as to require that it be based on "clear and convincing" evidence. *In the Interest of G.M., et al., Children,* 596 S.W.2d 846 (Tex.1980). The natural right between parents and their children is one of constitutional dimensions. *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976). We view this concept as applying to the degree of proof necessary to support a decree of termination. Termination of parental rights is complete, final, and irrevocable. It divests forever the parent and child of all legal rights, privileges, duties, and powers between each other except for the child's right to inherit. Our courts uniformly hold that for such reasons the proceedings below must be strictly scrutinized. *In the Interest of R.L.,* 620 S.W.2d 249 (Tex.Civ.App.1981, no writ).

■ The primary consideration in termination cases is what is in the best interest of the children. Where there is no jury, broad discretion is entrusted to the trial court, subject to the rules we set out in this opinion. Once made, the decision of the trial court will not be disturbed unless it appears from the record that there was an abuse of discretion. Normally, as a corollary to this rule of broad discretion, it would matter not what this Court might have done under the circumstances had we heard the evidence. We would only be permitted to determine whether such broad discretion had been abused. Under the clear and convincing evidence standard of proof, however, appellate courts have more discretion in determining whether there was sufficient evidence to support facts found by the trial court. *Hellman v. Kincy,* 632 S.W.2d 216 (Tex.Civ.App.1982, no writ).

■ We have carefully examined the entire record before this Court. Though the record contains some evidence of probative force to support the grounds for termination, we hold that the evidence is not clear and convincing.

Judgment of the trial court is reversed, and judgment is here rendered that appellees take nothing by their suit for termination of parental rights and for adoption.

EARL W. SMITH, Justice, dissenting.

I respectfully dissent for the following reasons. Under Tex.Fam.Code Ann. §§ 15.02(1)(F) and 15.02(2) (Supp.1985), the appellees were required to prove two facts in order for the court to terminate the parent-child relationship in this case. Both such facts must have been proven by "clear and convincing evidence." *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). The two facts which must have been proven were: (1) that the father had failed to support the child in accordance with his ability for one year, which year ended within six months of the filing of the petition to terminate the father's parental rights; and (2) that termination of the parent-child relationship was in the best interest of the child. On appeal, the appellant raises "no evidence" and "substantial evidence" points as to both of these elements. In considering "no evidence" points, appellate courts must review the evidence in the light most favorable to the verdict, considering only evidence and inferences which support findings of the trial court and rejecting evidence and inferences contrary to such findings. *McGowen v. State,* 558 S.W.2d 561, 564 (Tex.Civ.App. 1977, writ ref'd n.r.e.). In considering "insufficient evidence" points, appellate courts must review all of the evidence, and may set the verdict aside only if it is so contrary to the overwhelming weight of all the evidence as to be clearly wrong or manifestly unjust. *Id.*

As to the first element which the appellees had to prove, the evidence reflects that from October 1981 until January 1983, the appellant made no child support payments

even though he had been ordered by the court to pay $100 per month in child support. The petition in this case was filed on February 4, 1983, less than six months after January 1983. As to appellant's ability to make payments between October 1981 and January 1983, there exists a split in authority concerning whether there must be proof of appellant's ability to make support payments each of the twelve months of the relevant year. *Craddock v. Worley,* 601 S.W.2d 445, 446 (Tex.Civ.App.1980, no writ) holds "... the ability to pay support must exist each month during the twelve-month period." See also, *Brokenleg v. Butts,* 559 S.W.2d 853 (Tex.Civ.App.1977, writ ref'd n.r.e.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979), which is in agreement with *Craddock. McGowen* holds, however, "Inability to provide support during some months will not interrupt the running of the one year period if no effort is made to pay support during other months in which there is a clear ability to pay." *McGowen v. State, supra,* at 565. See also, *In the Interest of S.K.S.,* 648 S.W.2d 402 (Tex.App.1983, no writ), which follows *McGowen.*

This split in authority is important in the present case because the record demonstrates that although the appellant had quite limited funds during some months, he probably could have afforded some payments during other months of the relevant year. Documents from the IRS showed that in 1981 the appellant's income was $6,194, and in 1982 it was $4,239. Though the evidence concerning appellant's income was somewhat confusing, the record shows that during 1982 he paid no support although he worked in the oil field for 4 months, drew unemployment about 4 months ("I drawed $1,850. A hundred and something dollars a week"), earned $250 one day in April, and earned about $220 per week during the last two months of the year. Moreover, the evidence demonstrated that the appellant had few expenses because his father had given him a truck, and the appellant was purchasing his house with five acres of land from his father, who, according to the appellant, "[D]on't press me for [the $200 per month pay-

ments]." Further, the appellant's wife, whom he married in February 1983, testified that she had been living with appellant since February 1982, and that she helped pay their bills with her earnings of over $1,000 per month.

Thus, the record appears to contain "clear and convincing evidence" that the appellant did not support the child according to his ability for some months during the relevant one year period. *McGowen* should be followed by this Court. I would hold that the trial court's determination that appellant failed to support the child for one year should be affirmed. Any excuses which the appellant had for his failure to support the child according to his ability must be considered in relation to the second element which appellees must also prove (*i.e.,* that termination is in the child's best interest). *Holley v. Adams,* 544 S.W.2d 367 (Tex.1976).

*Holley, supra,* lists some considerations to use in deciding whether the second element which the appellees had to prove—that termination of the parent-child relationship was in the best interest of the child—was proven in this case. The considerations set out in *Holley* are: (A) the desires of the child; (B) the emotional and physical needs of the child; (C) the emotional and physical danger to the child; (D) the parental abilities of the persons seeking custody; (E) the programs available to promote the best interest of the child; (F) the plans for the child by those individuals or the agency seeking custody; (G) the stability of the future home; (H) acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) excuses for acts or omissions of the parent.

The evidence in this case as it relates to the considerations in *Holley* shows: (A) Although the child did not testify, the child's mother and stepfather testified that the child wanted to have the same name as her mother and stepfather. The child's schoolteacher also testified that the child calls her stepfather, "Dad," and that she likes to be with her stepfather and is very proud of him; (B) The child's mother, step-

father, and teacher, a neighbor, a family friend, and the social worker who evaluated the case all testified that the child was emotionally stable and well-adjusted, and that she appeared to be completely satisfied in her mother's and stepfather's home. On the other hand, the mother and stepfather testified that the father rarely contacted or visited the child, and that his sporadic contacts with the child confused and worried the child (*e.g.*, The mother testified that when the father did not call or send a gift on the child's fifth birthday, the child told her mother that "she bet her Daddy still thought she was four years old."). Furthermore, all the evidence indicated that the mother and stepfather would be capable of caring for the physical and emotional needs of the child. The father, on the other hand, had a long history of severe financial difficulties and of apparent neglect of the emotional and physical needs of the child; (C) Though there was no evidence indicating that the child had been in any physical danger, there was considerable testimony that the father's rare and sporadic contacts with the child caused her emotional grief; (D) While the evidence clearly showed that the mother and stepfather were concerned and capable parents, most of the evidence depicted the father as being either uncaring or unattentive to the needs of the child. The father's new wife did testify, however, that the father had a "special relationship" with his daughter; (E) The evidence showed that the child performed above average in her school subjects and that the mother and stepfather were helpful with her schoolwork and activities; (F) If the parent-child relationship were terminated, the stepfather planned to adopt the child, and he felt that this would make his good relationship with the child even better; (G) The mother's and stepfather's home appeared from the record to be highly stable and was described as "middle class" by the social worker; (H) The evidence that the father rarely made contact with his daughter (the mother testified that he did not visit the child for 10 months before they moved to Texas and did not call or visit for 17 months after they moved),

that he sent little or no money or gifts to help with her support (the mother testified that the father failed to send Christmas and birthday gifts), that the child was worried and confused about who her father was and why her father's contacts were so rare and sporadic, and that the father was disappointed when the child was born because he wanted a son instead of a daughter indicates that something was wrong with the existing parent-child relationship; (I) The father's excuses for his conduct were that he was broke because he was injured on his job, and so he could not send money for the child's support; that he felt the child did not need his money because the mother had told him that they were doing well financially; that he did visit with his child whenever his parents kept her and did send her presents; that he thought that he could not contact the child when he was behind in his support payments; and that he could not afford to visit the child after the mother remarried and moved to Texas. As discussed above, however, the father could probably have afforded some support payments, and there was testimony that the father did not visit even before the mother and child moved. Moreover, the trial court was not required to accept the truth or accuracy of the father's testimony. *Smith v. McLin*, 632 S.W.2d 390 (Tex.App.1982, writ ref'd n.r.e.).

After hearing this evidence, the trial court determined that termination of the parent-child relationship *would* be in the best interest of the child. Although appellate courts have more discretion under the clear and convincing evidence test in termination cases, the decision of the trial court should not be disturbed in such cases unless it appears from the record that there was an abuse of discretion. *Taylor v. Meek*, 276 S.W.2d 787, 790 (Tex.1955); *Hellman v. Kincy*, 632 S.W.2d 216 (Tex. App.1982, no writ); *In the Interest of R.D.P.*, 526 S.W.2d 135 (Tex.Civ.App.1975, no writ).

The appellant relies heavily on *Holley, supra,* in asserting that this case should be reversed. Unlike *Holley*, however, where-

in the Court found that there was no evidence that termination would be in the best interest of the child, in this case, the trial court heard an abundance of evidence indicating that the child's best interest would be served by termination of the parent-child relationship. Under the circumstances of this case, it does not appear that the trial court abused its discretion in terminating the parent-child relationship. Thus, the judgment of the trial court that termination of the parent-child relationship was in the child's best interest should be affirmed.