**Ruben PEÑA, Plaintiff–Appellant,**

v.

**Edward MATTOX, Charles Bretz, Patricia Schneider, and others unknown, Defendants–Appellees.**

No. 95–2053.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1995.

Decided May 21, 1996.

William W. Kurnik, Kurnik, Cipolla & Barasha, Arlington Heights, IL, John L. Martin, James L. Tuohy, James M. Urtis, Tuohy & Martin, Chicago, Il, for Edward Mattox.

James R. Schirott, Phillip A. Luetkehans (argued), Mary E. Dickson, Matthew F. Tarbox, Schirott & Luetkehans, Itasca, IL, for Charles Bretz.

Michael W. Condon (argued), Hervas, Sotos & Condon, Itasca, IL, for Patricia Schneider.

Before POSNER, Chief Judge, and LAY *
and ROVNER, Circuit Judges.

POSNER, Chief Judge.

This appeal from the dismissal of a complaint for failure to state a claim, and from the denial of a motion for reconsideration and for leave to file an amended complaint, presents two questions. The first is whether a man who becomes a father as a result of his criminal intercourse with a minor has an interest in the child that is protected by the due process clause of the Fourteenth Amendment as a form of liberty. The second (which we shall not have to decide, however) is whether interference by state officials with the filing of a suit under state law violates the federal Constitution.

The only source of facts is the allegations of the complaint, and we therefore take those allegations as true for purposes of this appeal. The plaintiff, Ruben Peña, began dating Amanda Mattox in 1991. Ruben was 19 and Amanda 15. Both were living in Illinois, Amanda with her parents. Amanda became pregnant by Ruben the following year. When Amanda's parents discovered her pregnancy they forbade her to continue seeing Ruben, but she disobeyed their order.

The months passed. He happened to visit her on the evening of December 8, 1992. Her pregnancy was far advanced. She complained to him that she felt sick. He urged her to tell her parents about the feeling. Sometime after he left he called to find out how she was doing. He could not reach her, and no one at her home would give him any

---

* Hon. Donald P. Lay of the Eighth Circuit, sitting        by designation.

information about her. He visited several hospitals looking for her, but without success.

The next night, Amanda's father, defendant Mattox, called Ruben and asked him to meet him at a restaurant. When Ruben arrived he was arrested on the basis of a felony criminal complaint signed by Mattox. The complaint charged Ruben with the felony of sexual intercourse with a person who is at least 13 but no older than 16 and at least five years younger than the defendant. 720 ILCS 5/12–16(d). Mattox knew that Amanda was not five years younger than Ruben. The complaint had been drafted or authorized by, and the warrant for Ruben's arrest procured by, a state prosecutor named Charles Bretz, who is also a defendant, and who also knew that the charges were false. Bail was set at $30,000.

When Ruben's sister learned of his arrest she called the Mattox home. Patricia Schneider, who was at the time an Illinois state judge and who is Amanda's aunt and another defendant, answered the phone, identified herself as a judge, told the sister not to call the Mattox residence again, and added that Ruben's bail would be increased the next day. Increased it was, to $45,000. Although the complaint does not charge Schneider with any role other than to field the phone call from Ruben's sister, the fact that she told the sister that Ruben's bail would be raised the next day, and that it was raised, suggests that she may have spoken to the judge who handled Ruben's case.

Ruben could not make bail and remained in jail. Two days later, however, the charges against him were reduced to criminal sexual abuse, a misdemeanor that differs from the felony with which he had been charged originally in not requiring the defendant to be at least five years older than his sexual partner. 720 ILCS 5/12–15(c). Had he been charged with a misdemeanor in the first place, his bail could not have exceeded $1,000. Ruben pleaded guilty to this offense the same day, received a sentence of 24 months supervision, and was released. One condition of his release was that he have no contact with Amanda or any member of her immediate family until April 19, 1994. Ruben left Illinois, fearful that the defendants would "continue to exert improper influence" over the law enforcement authorities of Illinois, as his complaint puts it.

The scheme to arrest and prosecute Ruben had been activated when Amanda, seven and a half months pregnant, went into labor on December 8, 1992 (that was the "sickness" which, unbeknownst to him, she was complaining of). Her parents spirited her off to Indiana, where she gave birth. The child was immediately placed for adoption. Ruben was not informed of the adoption or even that the child had been born and Amanda removed to Indiana, a state that has an unusual law, dispensing with the requirement that the father consent to adoption, if, as in this case, the mother was under 16 when the child was conceived. Ind.Code §§ 31–3–1–6(i)(2)(B)(ii), 35–42–4–3(c); *Mullis v. Kinder*, 568 N.E.2d 1087 (Ind.App.1991).

This suit was brought in June of 1994, some 18 months after the birth and arrest. The principal claim is that the defendants conspired to deprive the plaintiff of his parental rights. Since Bretz certainly and Schneider arguably were acting under color of state law, the conspiracy is actionable under 42 U.S.C. § 1983 even though the third defendant, Amanda's father, was not. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). (The remaining defendants are "persons unknown," and their role in the conspiracy is obscure.) The plaintiff seeks damages, not rights in the child which in any event these defendants have no power to give him.

■ Bretz claims immunity as a prosecutor (Schneider makes no claim of immunity), and rightly so with regard to everything that *he* did, such as the drafting or authorization of the original criminal complaint against the plaintiff, the procuring of the warrant, the request to increase Peña's bail, and the request that Peña be forbidden, as a condition of his punishment, to see Amanda. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). But the complaint alleges that he was a member of a conspiracy that went beyond the criminal prosecution of the plaintiff. A prosecutor has no immunity for the acts that he does outside his role as a prosecutor, *Buckley v. Fitzsimmons*, 509

U.S. 259, 271–78, 113 S.Ct. 2606, 2615–18, 125 L.Ed.2d 209 (1993); and the law of conspiracy would impute to him, as a coconspirator, the acts of the other, nonprosecutor members of the conspiracy. *United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir.1996). The acts directly connected with the criminal prosecution were not the most significant acts committed in furtherance of the conspiracy. What really defeated Ruben's effort to establish a parental right (besides Indiana law) was the fact that Amanda was taken out of the state, and the child put up for adoption, without his knowledge, and the further fact that he found himself, a stripling of 19, up against Illinois officialdom in the persons of a judge and a prosecutor.

■ It would not do to strip a judge or prosecutor of his immunity merely because he conspired with nonimmune persons. *Dennis v. Sparks*, 449 U.S. 24, 28, 30–31, 101 S.Ct. 183, 186, 187–88, 66 L.Ed.2d 185 (1980); *John v. Barron*, 897 F.2d 1387, 1392 (7th Cir.1990); *Young v. Biggers*, 938 F.2d 565, 569 (5th Cir.1991). But we are pretty sure that this principle does not extend to a case in which the conduct of the prosecutor's coconspirators includes acts wholly unrelated to the prosecutorial role. No doubt prosecutorial immunity would be worth little if it could be stripped away upon proof that the prosecutor "agreed" with his principal witness that the latter would fabricate evidence against the accused. But to take the next step and hold that it protects a prosecutor who hires a hit man to kill the accused should the latter be acquitted would carry the immunity both outside its historical scope and beyond the point at which it is necessary to protect prosecutors from being harassed by suits by the prosecuted. See *Buckley v. Fitzsimmons*, *supra*, 509 U.S. at 277, 113 S.Ct. at 2618. *Buckley* holds that a prosecutor lacks absolute immunity for violating the plaintiff's rights while conducting investigative work even if that work produces evidence that the prosecutor could with absolute immunity present to a grand jury. *Id.* at 275, 113 S.Ct. at 2617. We do not think the prosecutor's liability is less if he hires the investigator rather than conducting the investigation himself, and agrees that the investigator shall proceed without regard to the rights of the persons investigated.

■ From the issue of immunity we turn to the merits of the appeal. The defendants argue that when the deprivation of a constitutional right occurs through the unauthorized acts of subordinate state officials rather than through a decision made at the policymaking level of state or local government, the plaintiff must show that the state failed to provide adequate avenues of redress. This is the principle of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); see also *Hudson v. Palmer*, 468 U.S. 517, 531–33, 104 S.Ct. 3194, 3202–04, 82 L.Ed.2d 393 (1984). But the principle is limited to cases in which the deprivation is of a right that the due process clause secures only against the denial of procedural protection, *Parratt v. Taylor*, *supra*, 451 U.S. at 536, 101 S.Ct. at 1913; *Zinermon v. Burch*, 494 U.S. 113, 131–32, 110 S.Ct. 975, 986–87, 108 L.Ed.2d 100 (1990)—hence a right that can be infringed only by a denial of reasonable notice or of an opportunity for a fair hearing, the basic elements of due process in the procedural sense of the term. Otherwise an unconstitutional search, for example, could not give rise to a federal suit, since persons whose rights are infringed by a search have available to them state as well as federal judicial remedies. The search can give rise to a federal suit because the right asserted in such a suit derives from the substantive protections of the Fourth Amendment. The due process clause of the Fourteenth Amendment is merely the vehicle by which the right is enforceable against state as well as federal officers.

■ The claim here is that the defendants deprived Peña of a species of liberty that the Constitution protects from more than merely procedural infringements—denied him, that is, what is called "substantive due process." He claims that a father has a right to his child, a right shared with the mother but a genuine right nonetheless (just as the right of a joint tenant, though shared, is a genuine right), of which the defendants could not constitutionally deprive him no matter how elaborate the procedures they provide, just as they could not constitutionally deprive him

of his freedom of speech merely by taking it away in procedurally regular proceedings. See *id.* at 125, 110 S.Ct. at 983. No rights are absolute. A speaker can be punished for defamation even though defamatory speech is speech, and a child can be taken away from his parents, without a violation of the Constitution, upon adequate proof of abuse or neglect. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That does not make the parents' rights merely procedural.

What is true is that the Supreme Court's decisions dealing with parental rights, such as *Santosky* and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), speak mainly the language of procedural rather than of substantive due process. They emphasize the importance of the right not in order to show that it is more than procedural but rather to show that under the formula of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), it warrants a higher order of procedural protection. *Santosky v. Kramer, supra,* 455 U.S. at 759, 102 S.Ct. at 1397. *Stanley,* however, does add equal protection to the procedural brew, 405 U.S. at 658, 92 S.Ct. at 1216—understandably in view of the cases in which the Court has protected the rights of illegitimate children. E.g., *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); see *Bennemon on Behalf of Williams v. Sullivan,* 914 F.2d 987, 988–89 (7th Cir.1990). Stanley was an illegitimate father, as it were, and if illegitimate children are entitled to complain about discrimination in favor of legitimate children, perhaps unmarried fathers should be entitled to complain about discrimination in favor of married fathers. Discrimination to one side, if ever there were an appealing case for invoking the controversial and oft-abused doctrine of substantive due process it would be one in which the state tried to terminate parental rights on the basis of a bizarre though not necessarily discriminatory, invidious, or procedurally irregular belief—such as that Plato was right when in the *Republic* he proposed that all children be separated from their parents at birth and raised by the state. A dictum in *Quilloin v. Walcott,* 434 U.S. 246, 255, 98

S.Ct. 549, 54 L.Ed.2d 511 (1978), suggests that the Supreme Court would indeed strike down such a law in the name of substantive due process, even if the law applied to married as well as unmarried parents and therefore could not be attacked as a denial of equal protection.

The defense based on *Parratt* to Peña's suit must fail for another reason besides the fact that the right asserted in the suit is not purely a procedural one: the defendants prevented Peña from utilizing whatever procedural rights he might have had. By analogy (not that one is needed) to the doctrine of equitable estoppel, a defendant who prevents a plaintiff from exhausting his state judicial remedies should not be allowed to set up the plaintiff's failure to exhaust as a defense. Indiana law requires notice of a proposed adoption to be sent to the father and gives him 30 days after receiving the notice to contest the adoption. Had Peña followed this route he could have challenged the constitutionality of Indiana's refusal to allow the father to prevent the adoption if the mother was not yet 16 when she became pregnant by him. We need not consider the chances of such a challenge succeeding, although it will become plain that we do not rate those chances high. Here it is enough to note that Peña never received notice of the adoption and did not even know that the child was being adopted or in what state. By the time he found out, the 30 days had long since expired. The defendants do not argue that Peña could have challenged the adoption after the expiration of that period. It is possible that he could have, precisely because he had not received notice, *In re Paternity of Baby Girl Born 6–7–94,* 661 N.E.2d 873, 877–78 (Ind.App.1996) (and see our discussion below of *In re Adoption of Michael H.*)—although probably with only the dimmest chances of success. With every passing day, considerations of what is best for the child would weigh ever more heavily in favor of leaving the child with its adoptive parents. *Unwed Father v. Unwed Mother,* 177 Ind. App. 237, 379 N.E.2d 467, 473 (1978).

Even before the child was born, Peña could have sued in an Illinois state court for a declaration of paternity. 750 ILCS 45/7(a).

Had he gotten a judgment he could have taken it to an Indiana court, which, at least if the adoption had not yet become final, might—or might not—have been obliged to honor it by either the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A; *Thompson v. Thompson*, 484 U.S. 174, 183, 108 S.Ct. 513, 518, 518, 98 L.Ed.2d 512 (1988), or the Uniform Child Custody Jurisdiction Act, adopted by Indiana as Ind.Code ch. 11.6; see section 6 of the Act, Ind.Code § 31–1–11.6–6. The case law is in disarray. The statutes require states only to honor each other's custody decisions, and the cases disagree on whether a paternity suit should be viewed in that light, given the potential impact on custody (here, that of the adoptive parents). *Sheila L. on Behalf of Ronald M.M. v. Ronald P.M.*, 195 W.Va. 210, 465 S.E.2d 210, 221 (1995); *White v. Blake*, 859 S.W.2d 551, 562–63 (Tex.App.1993); *Yon v. Fleming*, 595 So.2d 573, 577 (Fla.App.1992); *Williams v. Knott*, 690 S.W.2d 605, 608 (Tex.App.1985). We need not decide. If the failure to exploit all available legal remedies were a defense to a deprivation of substantive constitutional rights (that is, rights to more than a fair procedure), which it is not, the defendants' argument would still be vulnerable—to the charge of being unrealistic. Until his arrest, Peña could not have been expected to realize the importance of bringing a suit to establish his paternity of the fetus, and after his arrest he was too intimidated to sue. So at least we must assume in the present posture of this suit, which was dismissed on the pleadings, before any evidence had been presented.

■ But the suit must fail nevertheless. The reason is that the plaintiff has no constitutionally protected interest in the offspring of his relationship with Amanda Mattox. We do not reach this conclusion because the Constitution is silent on the rights of parents or because the due process clause speaks of process rather than of substance. We regard these bridges as having been crossed, and we therefore assume that the Constitution forbids a state to deprive parents—fathers as well as mothers, including natural fathers—of their children without good reasons for doing so. But in the word "their" is concealed an important qualification. It is not the brute biological fact of parentage, but the existence of an actual or potential relationship that society recognizes as worthy of respect and protection, that activates the constitutional claim. *Lehr v. Robertson*, 463 U.S. 248, 259–62, 103 S.Ct. 2985, 2992–94, 77 L.Ed.2d 614 (1983). In an earlier era the relationship was that of a married person to the child born to or adopted by the marriage partners. Unmarried parents, especially fathers, lacked secure, constitutionally recognized parental rights, their relative rightlessness being the reciprocal of the illegitimate child's lack of secure, constitutionally recognized rights. 2 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 21.2, p. 572 (2d ed.1987).

That was yesterday. The moral consensus that insisted on confining procreation within marriage has shattered. More than one in five American children are now born out of wedlock. Their unmarried parents are "fornicators"; some are adulterers; fornication and adultery remain on the books of many states as crimes. But these crimes are not taken seriously, and when the father, though a fornicator, has established a relationship with his child, the relationship receives the prima facie protection of the Constitution, much as if he were married to the mother. *Stanley v. Illinois, supra*. (The adulterer, however, does not receive constitutional protection, provided the mother and her husband want to raise the child as their own. *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).) This principle rests on a practical recognition that biology and association can together establish a relationship between father and child that may be essential to the happiness of both, even if the formality of marriage is missing. In this case, of course, there was and is no relation, other than the biological, between natural father and child, but as this was not the father's fault (as in such cases as *Lehr v. Robertson, supra*, 463 U.S. at 263–65, 103 S.Ct. at 2994–95, and *Shoecraft v. Catholic Social Services Bureau, Inc.*, 222 Neb. 574, 385 N.W.2d 448, 452 (1986)), it is not decisive against his claim. E.g., *Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 627, 823 P.2d 1216, 1228 (1992); *In re Adoption of Baby Boy Doe*, 717 P.2d 686 (Utah 1986).

But no court has gone so far as to hold that the mere fact of fatherhood, consequent upon a criminal act that our society does take seriously and that is not cemented (whoever's fault that is) by association with the child, creates an interest that the Constitution protects in the name of liberty. The plaintiff's counsel conceded in response to a question at argument that had Amanda's child been conceived as the result of a violent rape, the rapist would have acquired no constitutional right to interfere with the adoption of the child or otherwise to assert a parent's rights. We think it equally plain that had Ruben been 40 years old and Amanda 12 when she became pregnant by him, the Constitution would not have entitled him to assert a parental right. The criminal does not acquire constitutional rights by his crime other than the procedural rights that the Constitution confers on criminal defendants. Pregnancy is an aggravating circumstance of a sexual offense, not a mitigating circumstance. The criminal should not be rewarded for having committed the aggravated form of the offense by receiving parental rights which he may be able to swap for the agreement of the victim's family not to press criminal charges.

The offense that Ruben Peña committed was not as serious as the offenses that we have described. The sexual act was consensual, Ruben was 19 rather than 40, and Amanda was 15 rather than 12. The offense was a misdemeanor rather than a felony. But statutory rape, even in its misdemeanor form, that is, even if not aggravated by an extreme disparity in ages or the extreme youth of one of the sexual partners, is not one of those crimes like adultery or fornication that remain on the statute books, archaic and unenforced, as a residue of legislative inertia. It is not merely some quirk of Hoosier morality or religious conservatism. AIDS, abortion, and welfare have heightened public concern with teenage sex and pregnancy. In most states of the United States sex with a 15–year–old is a crime and is likely (somewhat, not highly, likely) to be prosecuted if a complaint is filed. A Congressman from Illinois was sent to prison recently for having sex with a 16–year–old. The conduct in which Ruben engaged with Amanda, and the sequel, her pregnancy, are conduct and consequence of which most societies, even today, strongly disapprove and for excellent reasons. A pregnancy is a serious misfortune for a 15–year–old. The Constitution does not forbid the states to penalize the father's illicit and harmful conduct by refusing to grant him parental rights that he can use to block an adoption or simply enjoy as the fruit of his crime.

The maxim that a wrongdoer shall not profit from his wrong is deeply inscribed in the Anglo–American legal tradition. *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 188 (1889). It sometimes clashes with, and is sometimes even overridden by, competing principles. Where the wrong is of a technical, trivial character and the cost of righting it would be great, the maxim yields, as in cases in which a father who has established an enduring relationship with his child seeks constitutional protection for the relationship in the face of an argument that as a fornicator he should have no rights. The balance is different in a case such as the present. There is no relationship between plaintiff and child beyond the genetic and the wrong is not of a technical, trivial nature. We find only two published decisions in which parental rights have been granted to a male statutory rapist, and in both he was offering to support the child and thus, unlike this case, shoulder the burdens as well as seeking the benefits of his wrongdoing. *In re Craig "V"*, 116 A.D.2d 130, 500 N.Y.S.2d 568 (1986); *In re Paternity Petition of LaCroix v. Deyo*, 108 Misc.2d 382, 437 N.Y.S.2d 517 (Fam.Ct.1981). These decisions emphasize the value to the child of the father's offer of support. There is no offer here, and the child has a father, albeit adoptive rather than natural. We have found cases in which an underage male, the victim of statutory rape by a woman, has been required to pay child support. *State ex rel. Hermesmann v. Seyer*, 252 Kan. 646, 847 P.2d 1273 (1993); *Jevning v. Cichos*, 499 N.W.2d 515 (Minn.App.1993); *In re Paternity of J.L.H.*, 149 Wis.2d 349, 441 N.W.2d 273 (App.1989). These cases could be thought to be "rewarding" the malefactress by lightening the cost to her of supporting the child. But of course the motive is different; it is to help the child. Peña is not offering to sup-

port the child, who already has, in any event, two parents. He is not to be criticized for not offering support. His parental rights were severed by the adoption and he does not seek their restoration, perhaps out of consideration for the child. Our point is only that if child support were being sought from him, he would have an argument that parental duties imply correlative parental rights.

In denying him the benefit of this argument we are not rewarding the defendants for having prevented Peña from obtaining parental rights in the first place by spiriting Amanda out of the state and putting the child up for adoption as soon as it was born. The cases that we have cited in which parental rights were granted to statutory rapists are not cases in which the rapist was trying to block an adoption. A statutory rapist who has managed somehow to establish a relationship with his child or who in default of adoption is being dunned for child support may have a claim to parental rights. But he does not have a right to create such a relationship by blocking the adoption of the child. To recognize a blocking right would be to allow the wrongdoer to benefit from his wrongdoing. Dicta in some cases, e.g., *In re Adoption of Michael H.*, 10 Cal.4th 1043, 43 Cal.Rptr.2d 445, 898 P.2d 891, 901 (1995), suggest that an unmarried father might be allowed, if not to block, at least to be heard in opposition to, the adoption of his child if he moved as swiftly as circumstances allowed to establish his willingness to assume parental responsibilities. But, since fornication is not a crime in every state, not every unmarried father is a criminal.

Peña argues that he paid for his crime by being placed on supervision for 24 months, and the slate should now be wiped clean. But the murdering heir who is sent to prison for his crime is not allowed upon release to claim his inheritance on the ground that he has been punished enough, or the murderer allowed to defend against the wrongful-death suit of his victim's estate on the ground that he has suffered enough by being punished by the criminal law. These analogies are imperfect. But they show that criminal punishment does not necessarily wipe the slate clean, putting the criminal back in exactly the position that he would have occupied had he not committed the crime. Indiana did not want Peña to impregnate an underage female and does not want to reward him for his having done so by bestowing the rights of a parent on him—more precisely, the financial equivalent of those rights, for which he is suing.

The plaintiff argues that most states, perhaps all but Indiana, do recognize the parental rights of child molesters and statutory rapists. That is not all clear. The cases are very few, as we have seen, and most of them involve a female rather than male violator of the sex statutes, reflecting the traditional, and still widely accepted, view that the unmarried mother has greater rights than the man who impregnated her because the burdens of pregnancy always and of parenting usually are greater for the mother than for the father. See not only the Clark treatise cited earlier but also *Planned Parenthood v. Danforth*, 428 U.S. 52, 71, 96 S.Ct. 2831, 2842, 49 L.Ed.2d 788 (1976); *Planned Parenthood v. Casey*, 505 U.S. 833, 896, 112 S.Ct. 2791, 2830, 120 L.Ed.2d 674 (1992). All are distinguishable from this case, as we have seen. No weight can be given to the fact that states do not have *explicit* exceptions in their parental right statutes for the rapist, etc. This absence does not prove that any of these states would interpret the statutes as entitling the rapist, statutory or otherwise, to obtain the rights of a parent. Judge-crafted exceptions to statutes are common and uncontroversial where necessary to avoid absurd results. Recall counsel's concession that the violent rapist would not be entitled to any parental rights—yet there is no exception in the statutes for violent rapists any more than there is for statutory rapists. When a state court does grant parental rights to the statutory rapist, thinking that as a practical if not legal matter it will be impossible to enforce a duty of child support against the father without giving him rights to the child, this is a pragmatic judgment that may confirm the wisdom of the state legislatures in not enacting a blanket exclusion of the criminal father from entitlement to a father's rights, but that does not dictate the constitutional interpretation that the plaintiff seeks, especially in a case in which

the duty of support is not involved. These statutes, their silences, the policies reflected in their interpretation, their practical enforcement by child welfare authorities in the different states—none of these things shows that a national consensus has formed around the proposition that a child conceived in crime belongs to the criminal.

When we asked the plaintiff's counsel what his strongest argument (apart from arguments based on the cases, which do not support his claim) was, he told us that the father deserves the child and the child the father. We have adequately discussed the first half of this proposition. As for the second, we think a state has discretion to decide whether it is better to encourage the kind of conduct in which the plaintiff engaged by giving him parental rights or discourage it by refusing to bestow legal protection on the relationship between father and child. The interest asserted by the plaintiff is not so compelling as to warrant our overriding the state's choice in the name of the Constitution.

■ The plaintiff's second claim, which is unrelated to the first, is that by blocking him from filing his Illinois paternity action the defendants took away a form of liberty or property—the right of access to the courts—in violation of the due process clause of the Fourteenth Amendment. As we saw earlier, it is not clear that an Illinois paternity suit would have blocked the adoption; but let us assume it would have.

Many of the cases that the plaintiff cites in support of the right to access claim involve the denial of access to the courts by inmates of jails and prisons who wish to assert federal claims, e.g., *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); for those are most of the cases in which the right has been recognized. They are cases, however, in which a federal right of access to the courts can be viewed as derivative from the federal substantive rights sought to be enforced. *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974); *Casteel v. Pieschek*, 3 F.3d 1050, 1056 (7th Cir.1993). The derivative right is not involved in the present case. The plaintiff was not prevented during his two days in jail from obtaining access to the courts to assert

any federal constitutional right that he might have had as a consequence of the circumstances of his arrest and incarceration. And this is not a case in which a public officer is charged with having discriminated against the plaintiff on a forbidden ground, as in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Peña is complaining that the defendants deprived him of a state-court remedy for a state-law right; and it might be thought that for such a deprivation state-law doctrines of fraudulent concealment, equitable estoppel, malicious prosecution, and abuse of process provide all the process that is due. Peña's complaint contains pendent state law claims for abuse of process and malicious prosecution. The district judge properly relinquished jurisdiction over these claims when he dismissed the plaintiff's federal-law claims. 28 U.S.C. § 1367(c)(3). No one supposes that every time a public employee does something that caused a plaintiff having a claim under state law to miss a filing deadline, the plaintiff can sue for a deprivation of a constitutional right. *Crowder v. Sinyard*, 884 F.2d 804 (5th Cir.1989), disapproved on other grounds by *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). And although the right to a remedy is not the same thing as the right to notice and a hearing, e.g., *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir.1986); *Morello v. James*, 810 F.2d 344 (2d Cir.1987), the principle of *Parratt v. Taylor*, discussed earlier, might be thought to bar a plaintiff who had an adequate state judicial remedy from complaining in federal court of a random and unauthorized abuse of process by state officers.

Notwithstanding the concerns that we have expressed, a number of cases recognize a right of access to the courts without tying the right to some underlying federal right that the plaintiff wants access to the courts in order to enforce. In most of these, like our own *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261–65 (7th Cir.1984), and *Crowder v. Sinyard, supra*, 884 F.2d at 811–12, it is obvious, whether or not the court remarked the point, that the plaintiff sought access in order to enforce a federal right. But in quite

a number of other cases, illustrated by *Schrier v. Halford*, 60 F.3d 1309 (8th Cir.1995); *Jackson v. Procunier, supra; Ryland v. Shapiro*, 708 F.2d 967, 971–75 (5th Cir.1983), and *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427–28 (8th Cir. 1986) (which incidentally rejects a *Parratt* limitation on the right of access to the courts, *id.* at 1428 n. 10), it is equally clear that the underlying right was not federal, though some of the cases, such as *Schrier*, construe the right of access more narrowly if there is no underlying federal right. These cases identify a number of possible sources for an independent, nonderivative federal constitutional right of access to the courts, including the privileges and immunities clause, the petition clause of the First Amendment, and the due process clause. Although there is support in some decisions of the Supreme Court, notably *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), it does not appear that the Court has ever examined the question carefully.

We need not try in this case to resolve the issue, which, depending on how broadly or narrowly one reads *Bell*, may be open in this circuit. The issue is waived. The only federal claim in the complaint is a claim that the defendants deprived the plaintiff of his parental rights. The plaintiff's brief in opposition to the motion to dismiss the complaint did not allude to the right of access to the courts. A claim of infringement of the right did not appear until a post-judgment motion. That was too late.

■ The last issue is whether the district judge abused his discretion in refusing to allow the plaintiff to amend his complaint after judgment to add a count for false arrest in violation of the Fourth Amendment. Had the plaintiff correctly been charged with a misdemeanor rather than a felony, he would still have been arrested, but the bail would have been set much lower—it could not have exceeded $1,000, possibly within his reach—and so he might not have had to spend two days in jail. If the defendants deprived the plaintiff of his liberty for two days on the basis of criminal charges that they knew to be false, they violated his constitutional

rights. So there is a colorable claim lurking here, though it is not a false arrest claim. See, e.g., *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1142–43 (7th Cir.1987). There was probable cause to arrest Peña, though only for the misdemeanor offense. That is a detail. What prevents Peña from obtaining relief for the deprivation of his liberty is the rule that once your suit is dismissed you cannot get the complaint amended without first asking that the judgment be set aside. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 784–85 (7th Cir.1994). The suit is over. There is no complaint to amend. Peña did not ask the district court to set aside the judgment, and therefore his motion to amend the complaint was properly denied.

■ The plaintiff also argues, however, that he didn't *have* to seek to amend the complaint, because the narrative of facts in the complaint clearly showed that he had been falsely arrested; the court should have assumed that the complaint charged this and not dismissed the suit. But if the plaintiff had wanted to charge false arrest in the original complaint rather than merely include it in an enumeration of the overt acts of the conspiracy, he would have done so or at least would have voiced the charge when he was resisting the dismissal of the complaint for failure to state a claim. The misnamed false-arrest charge, like the charge of denial of access to the courts, was plainly an afterthought, thrown into the hopper after the judge had rejected the other claims, and indeed after he had dismissed the suit; so it is waived. *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir.1995).

We note that although those two days of lost liberty were due to the size of the bail, the plaintiff has not claimed a violation of the excessive-bail provision of the Eighth Amendment. We therefore need not decide whether that provision is applicable (by interpretation of the due process clause of the Fourteenth Amendment) to the states, as we assumed in *Faheem–El v. Klincar*, 841 F.2d 712, 718 n. 8 (7th Cir.1988) (en banc), but which was left open in *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 n. 22, 109 S.Ct. 2909, 2920 n. 22, 106 L.Ed.2d 219 (1989) (though its

applicability was strongly urged in a separate opinion, *id.* at 283–84, 109 S.Ct. at 2924–25), or whether, if so, it is enforceable by means of a suit for damages, as assumed in *Wagenmann v. Adams,* 829 F.2d 196 (1st Cir.1987).

AFFIRMED.